# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| Citizens United, and<br>Citizens United Foundation,<br><br>Plaintiffs,<br><br>vs.<br><br>Eric Schneiderman, in his official<br>capacity as New York Attorney<br>General,<br><br>Defendant. | **Case No. 1:14-cv-03703-SHS**<br><br><br>**Judge Sidney H. Stein** |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Donald F. McGahn
  (*pro hac vice application pending*)
Todd R. Geremia
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Phone: (202) 879-3939
Facsimile: (202) 626-1700

Michael Boos (*pro hac vice application pending*)
General Counsel
Citizens United & Citizens United Foundation
1006 Pennsylvania Ave., S.E.
Washington, DC 20003
Phone: (202) 547-5240
Facsimile: (202) 547-5421

## TABLE OF CONTENTS

I.     PLAINTIFFS HAVE A STRONG LIKELIHOOD OF SUCCESS ON THE
       MERITS ....................................................................................................................4

       A.     The Attorney General's New Ban on Charitable Solicitation Is
              Unconstitutional. ...........................................................................................4

              1.     Speech Licensing by the Attorney General is Unconstitutional .......5

              2.     The Attorney General Lacks a Compelling Interest For His Policy ...............6

              3.     The Attorney General's New Policy Lacks the Requisite Tailoring.................8

              4.     The Attorney General Forces an Unconstitutional Choice Between
                     Which Rights to Forego, and Is Premised Upon an Unbridled Grant
                     of Authority ................................................................................8

                     a.     Plaintiffs cannot be forced to choose between Constitutional
                            protections........................................................................8

                     b.     The Attorney General cannot have unfettered discretion as to
                            policies adversely impacting Constitutional rights..............................10

       B.     The Attorney General's New Policy Violates the Due Process Clause and
              New York Administrative Law...........................................................................13

              1.     The New Policy Lacks the Sort of Prior Notice That Due Process
                     Demands ................................................................................13

              2.     The Attorney General Failed to Provide Notice and Comment ....................14

       C.     The Attorney General's New Policy is Preempted by Federal Law.............................16

              1.     The Supreme Court has recognized the sort of preemption present
                     here........................................................................................16

              2.     The Attorney General is in conflict with Federal law.......................................18

II.    THE NEW POLICY IRREPARABLY HARMS PLAINTIFFS BY BANNING
       SOLICITATONS AND POLITICAL SPEECH .....................................................19

III.   THE BALANCE OF EQUITIES TIPS DECIDEDLY IN PLAINITFFS' FAVOR .........21

IV.    AN INJUNCTON IS IN THE PUBLIC INTEREST..............................................................23

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*414 Theater Corp. v. Murphy*,
499 F.2d 1155 (2d Cir. 1974) ...............................................................................21

*Am. Civil Liberties Union v. Ashcroft*,
322 F.3d 240 (3d Cir. 2003), *aff'd*, 542 U.S. 656 (2004)...................................21

*Am. Target Adver., Inc. v. Giani*,
199 F.3d 1241 (10th Cir. 2000) ........................................................................2, 11

*Arizona v. Inter-Tribal Council of Arizona*,
133 S. Ct. 2247 (2013) ..........................................................................................13

*Arnett v. Kennedy*,
416 U.S. 134 (1974) (Marshall, J., dissenting) .........................................................11

*Barclay Knitwear Co. v. Kingswear Enterprises*,
141 A.D.2d 241, 247 (N.Y. App. Div. 1988) ......................................................15

*Buckley v. Valeo*,
424 U.S. 1 (1976) (per curiam)....................................................................9, 19, 20, 25

*Capital Newspapers Div. of Hearst Corp. v. Burns*,
67 N.Y.2d 562 (1986) ..............................................................................................9

*Car Barn Flats Residents' Ass'n v. N.Y. State Div. of Hous. & Cmty. Renewal*,
184 Misc.2d 826 (N.Y. Sup. Ct. 2000) ................................................................14

*Chabad of Southern Ohio v. City of Cincinnati*,
363 F.3d 427, 436 (6th Cir. 2004).........................................................................25

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir 2006) ..............................................................................20

*Christian Legal Society v. Walker*,
453 F.3d 853 (7th Cir. 2006) .................................................................................25

*Citizens Against Rent Control v. City of Berkeley*,
454 U.S. 290 (1981).........................................................................................20, 24

*Citizens United v. FEC*,
558 U.S. 310 (2010) ............................................................................................6, 22

*City of Lakewood v. Plain Dealer Publ'g Co.,*
   486 U.S. 750 (1988) ...............................................................................1, 10

*Connors v. Hartford Fire Ins. Co.,*
138 A.D.2d 877 (N.Y. App. Div. 1988) .............................................................15

*Davis v. FEC,*
   554 U.S. 724 (2008) ...............................................................................10, 19

*Duane Reade, Inc. v. Cardtronics, LP,*
   54 A.D.3d 137 (N.Y. App. Div. 2008) ............................................................15

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council,*
   485 U.S. 568 (1988) ...................................................................................13

*Elrod v. Burns,*
   427 U.S. 347 (1976) (plurality opinion) .........................................................19

*FCC v. Fox Television Stations, Inc.,*
   132 S. Ct. 2307 (2012) ...........................................................................2,13,14

*FEC v. Wisc. Right to Life, Inc.,*
   551 U.S. 449 (2007) ...............................................................................8,21, 25

*First Nat'l Bank v. Bellotti,*
   435 U.S. 765 (1978) .....................................................................................24

*Forsyth County, Georgia v. Nationalist Movement,*
   505 U.S. 123 (1992) .....................................................................................10

*Gade v. Nat'l Solid Wastes Mgm't Ass'n,*
   505 U.S. 88 (1992) (plurality opinion) ...........................................................17

*Garrison v. Louisiana,*
   379 U.S. 64 (1964) .......................................................................................24

*Giovani Carandola, Ltd. v. Bason,*
   303 F.3d 507 (4th Cir. 2002) .......................................................................25

*Green v. Javits,*
   7 Misc. 2d 312, 314, 166 N.Y.S.2d 198, 201 (Sup. Ct. 1957) ...........................6

*Homans v. City of Albuquerque,*
   264 F.3d 1240 (10th Cir. 2001) (per curiam) .................................................22

*Illinois ex rel. Madigan v. Telemarketing Assocs.,*
   538 U.S. 600 (2003) .....................................................................................5, 8

*Int'l Paper Co. v. Ouellette,*
   479 U.S. 481 (1987) ...........................................................................17, 18, 19

*Klein v. City of San Clemente,*
   584 F.3d 1196 (9th Cir. 2009) ..............................................................20, 21

*L.P. Acquisition Co. v. Tyson,*
   772 F.2d 201 (6th Cir. 1985)........................................................................24

*Long v. Adirondack Park Agency,*
   76 N.Y.2d 416 (1990) ...................................................................................15

*Matter of Daimlerchrysler Corp. v. Spitzer,*
   26 A.D.3d 88 (N.Y. App. Div. 2005) ..........................................................15

*McIntyre v. Ohio,*
   514 U.S. 334 (1995) ........................................................................................9

*Mich. Canners & Freezers Ass'n v. Agric. Mktg. & Bargaining Bd.,*
   467 U.S. 461 (1984) ........................................................................16, 17, 18

*Mich. Chamber of Commerce v. Land,*
   725 F. Supp. 2d 665 (W.D. Mich. 2010) ...................................................22

*Mills v. Alabama,*
   384 U.S. 214 (1966) ......................................................................................24

*N.Y. Progress & Prot. PAC v. Walsh,*
   733 F.3d 483, 486 (2d Cir. 2013) ....................................................4, 19, 25

*NAACP v. Alabama,*
   357 U.S. 449 (1958) ..................................................................................8, 10

*Nat'l Treas. Employees Union v. U.S. Dep't of Treas.,*
   838 F. Supp. 631 (D.D.C. 1993) .................................................................24

*Near v. Minnesota,*
   283 U.S. 697 (1931) ......................................................................................10

*N.Y. Times v. U.S.,*
   403 U.S. 713 (1971) ......................................................................................10

*Pacific Frontier v. Pleasant Grove City,*
   414 F.3d 1221 (10th Cir. 2005) ...................................................................10

*Preminger v. Principi,*
   422 F.3d 815 (9th Cir. 2005) .......................................................................25

*Public Citizen, Inc. v. Pinellas County*,
  321 F.Supp. 2d 1275 (M.D. Fla. 2004) ................................................................11, 12

*R.A.V. v. City of St. Paul*,
  505 U.S. 377, 392 (1992) ..................................................................................................6

*Random House, Inc. v. Rosetta Books LLC*,
  283 F.3d 490 (2d Cir. 2002) (per curiam) .................................................4,21, 23

*Remba v. Federation Employment & Guidance Service*,
  149 A.D.2d 131 (N.Y. App. Div. 1989) ...............................................................15

*Richardson v. Comm'r of N.Y. City Dep't of Soc. Servs.*,
  88 N.Y.2d 35 (1996) .................................................................................................16

*Schneider v. State*,
  308 U.S. 147 (1939) .....................................................................................................7

*Schwartfigure v. Hartnett*,
  83 N.Y.2d 296 (1994) ..................................................................................14,15, 16

*Stahl v. City of St. Louis*,
  687 F.3d 1038 (8th Cir. 2012) ..................................................................................20

*Staub v. City of Baxley*,
  355 U.S. 313 (1958) ...................................................................................................11

*Summum v. Pleasant Grove City*,
  483 F.3d 1044 (10th Cir. 2007) .........................................................................20, 21

*Talley v. California*,
  362 U.S. 60 (1960) ..................................................................................................9, 10

*Thomas v. Collins*,
  323 U.S. 516 (1945) .....................................................................................................5

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*,
  425 U.S. 748 (1976) .....................................................................................................7

*Village of Schaumberg v. Citizens for a Better Env't*,
  444 U.S. 620 (1980) ........................................................................................... *passim*

*Virginia v. Am. Bookseller's Ass'n*,
  484 U.S. 383 (1988) ...................................................................................................21

*Wash. Post Co. v. N.Y. State Ins. Dep't*,
  61 N.Y.2d 557 (1984) ...................................................................................................9

*Wis. Dep't of Indus., Labor, & Human Relations v. Gould, Inc.,*
  475 U.S. 282 (1986) ............................................................17, 19

*Wisconsin v. Constantineau,*
  400 U.S. 433 (1971) ...................................................................14

**STATUTES**

26 U.S.C. § 501(c)(3) .....................................................................3

26 U.S.C. § 501(c)(4) .....................................................................3

26 U.S.C. § 6103 ...................................................................*passim*

26 U.S.C. § 6104 ...................................................................*passim*

26 U.S.C. § 7213 ...............................................................4, 19, 23

33 U.S.C. § 1365 ..........................................................................18

N.Y. Exec. Law § 172 ..................................................................12

N.Y. Exec. Law § 177 .................................................5, 6, 12, 20

N.Y. Exec. Law § 172-b ..........................................5, 12, 20

N.Y. SAPA § 202 ...........................................................................2

N.Y. SAPA § 102(2)(a) ..........................................................14, 15

13 NYCRR § 91.5(c) ........................................................4, 15, 20

13 NYCRR § 92.3(b)(2) (2003) ..................................................15

**OTHER AUTHORITIES**

NY Attorney General's Charities Bureau, Summary of Annual Filing Requirements ..............7, 9, 22

*Ethics & Accountability in the Nonprofit Sector* ....................................9

S. Rep. No. 91-552 (1969), *reprinted in* 1969 U.S.C.C.A.N. 2027 ................18, 23

Federal Election Commission Advisory Opinion 2010-08 .......................3, 10

IRS Form 990 Instructions................................................................9

## INTRODUCTION

Plaintiffs Citizens United and Citizens United Foundation are both non-profit entities that wish to solicit funds in New York.  For years, they have been able to solicit funds without being hampered by state regulation or interference.  In the past, they were required to file with the Attorney General's Charities Bureau the CHAR 500 form, and include their otherwise-public IRS Form 990.  They did this for years without incident.  Now, subsequent to the election of Eric Schneiderman as New York Attorney General, and without any sort of prior notice or opportunity for comment, the Attorney General's Charities Bureau began demanding that Plaintiffs file both their publicly-available Form 990 <u>and</u> their confidential list of donors found on their IRS Schedule B, despite the fact that the regulation governing disclosure has gone unchanged since 2006.  And this demand comes with a threat: Failure to provide the recently-demanded Schedule B directly to the Charities Bureau carries the risk of prosecution for violation of the ban on unregistered solicitation within New York.  Plaintiffs seek an injunction regarding this ban, and have a strong likelihood of success on the merits, because:

*First,* the Supreme Court has struck bans on solicitations in similar contexts.  Plaintiffs make documentary films and produce other media that discuss political issues, and when soliciting funds to support such efforts, discuss those issues in detail.  Banning such communications violates the First Amendment since such issue-based solicitations "necessarily combine the solicitation of financial support with the functions of information dissemination, discussion, and advocacy of public issues."  *Village of Schaumberg v. Citizens for a Better Env't*, 444 U.S. 620, 635 (1980) (internal quotations omitted).  Likewise, government officials may not be granted the sort of unbridled discretion now claimed by the Attorney General in making rules governing the exercise of protected free speech, *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 770 (1988) (licensing scheme that vests government official with unbridled discretion to grant or deny a permit violates the First

Amendment), and courts have applied this principle in striking down similar claims of unbridled power in the context of soliciting funds for charitable organizations. *Am. Target Adver., Inc. v. Giani*, 199 F.3d 1241, 1250-53 (10th Cir. 2000) (striking a section of Utah's charitable solicitation statute).

**Second,** the Attorney General's new demand for Schedule B was done *via* administrative fiat, without any sort of prior notice or opportunity for public comment. Although the current regulation has not been amended for six years, only recently has the Charities Bureau demanded the submission of Schedule B. Such a change contravenes due process, *see FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307 (2012), and violates the New York State Administrative Procedures Act ("SAPA"), which requires public notice and comment prior to such action. *See* SAPA § 202.

**Third,** by demanding Schedule B directly from the organization, the Attorney General is circumventing federal law that would otherwise protect it from public disclosure. Federal law provides a mechanism for New York to obtain Schedule B for certain purposes, 26 U.S.C. § 6104(c)(3), while also imposing felony penalties for those who make such information public. 26 U.S.C. §§ 6103, 7213. Given that federal law provides for donor confidentiality, the new policy is preempted by Federal law. Moreover, as the Attorney General already has a mechanism for accessing such information under Federal law, he has no need to enforce his new policy.

In addition to its strong likelihood of success on the merits, the Attorney General's new demands irreparably harm Plaintiffs, while an injunction would impose no hardship, or even any meaningful consequence to New York. Plaintiffs have three immediate needs to solicit funds and otherwise speak in New York:

> *First*, to promote and raise funds for the production of a documentary film that would be a sequel to Plaintiffs' now infamous film, *Hillary – the Movie*;
>
> *Second*, to publicly oppose recent efforts by the Internal Revenue Service to target certain ideological non-profits, including but limited to funding litigation challenging recent rulemaking efforts and other IRS missteps; and

***Third***, to publicly criticize the New York Attorney General's own policies and missteps, including but not limited to the policy challenged herein.

All Plaintiffs seek is to be able to speak in New York, and express their views in connection with soliciting funds to further their message, without risking the release of their confidential donor information. Such risk places Plaintiffs in an unconstitutional Catch-22: either provide Schedule B and risk public disclosure and chilling donors' willingness to give, or refrain from speaking in New York. Such a choice causes irreparable harm to Plaintiffs, whereas an injunction would not prevent New York from obtaining information that it seeks, albeit in manner that ensures confidentiality. To Plaintiffs, the new policy only serves to intimidate donors who may hold political beliefs antithetical to those of the current Attorney General. The Attorney General ought to be enjoined.

## FACTS

Plaintiff Citizens United is a Virginia non-stock, non-profit (under 26 U.S.C. § 501(c)(4)), membership corporation with its principal office in Washington, D.C. As a media company, Citizens United is exempt from the Federal Election Campaign Act of 1971, as amended. *See* Federal Election Commission Advisory Opinion 2010-08. Plaintiff Citizens United Foundation is a Virginia non-stock, non-profit (under 26 U.S.C. § 501(c)(3)) corporation with its principal office in Washington, D.C. Defendant Eric T. Schneiderman is the New York State Attorney General.

Both Citizens United and Citizens United Foundation are funded primarily by donations from individuals who support each organization's purpose and message. Bossie Affidavit at ¶ 5. To support their activities, Citizens United and Citizens United Foundation produce movies, advertising, other communications, and solicit funds nationwide, and wish to continue to do so in New York. *Id.* at ¶¶ 4-5. Plaintiffs occasionally solicit in person, and solicit *via* mail and *via* telephone. In addition to asking for donations, Plaintiffs also describe in extensive detail their mission, their activities, and seek support for their advocacy of positions on issues of public concern, while simultaneously articulating such positions. *Id.* at ¶¶ 14-18. Their donors are not

3

made public and kept confidential, and are assured of such confidentiality when solicited.  *Id.* at ¶ 6. Although disclosed to the Internal Revenue Service as part of its required IRS Form 990 filing (specifically, donors are listed on Schedule B), such submission does not publicly reveal the identity of its donors.  In fact, federal law prohibits the release of this information, the violation of which can result in felony prosecution.  26 U.S.C. §§ 6103(a), 7213.  Today, Plaintiffs wish to solicit within New York, but according the Attorney General's Charities Bureau, cannot do so without providing directly to New York their non-public list of donors.  Plaintiffs seek an injunction.

<u>**ARGUMENT**</u>

The standard of review used to determine whether an applicant is entitled to a preliminary injunction is well established: "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013).  Alternatively, a plaintiff may demonstrate "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor."  *Random House, Inc. v. Rosetta Books LLC*, 283 F.3d 490, 491 (2d Cir. 2002) (per curiam).

I.   **PLAINTIFFS HAVE A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS**

**A.  The Attorney General's New Ban on Charitable Solicitation Is Unconstitutional.**

New York law requires that certain nonprofits must file form CHAR 500 annually with the Bureau.  13 NYCRR § 91.5(c)(1).  The Attorney General's Charities Bureau now claims that the CHAR 500 must include a non-public list of donors.  Failure to comply prohibits the entity from engaging in any fundraising activities in New York.  N.Y. Exec. Law § 172-b(5).  Penalties for a violation of the ban are significant:  The Attorney General may seek civil penalties of $1,000 per

4

violation and up to $100 per day for noncompliance with the registration requirements. *Id.* § 177(2)(b). The Attorney General may also revoke, suspend, or deny registration of a charitable organization and thus ban it from soliciting in New York. *Id.* § 177(2)(a).

### 1. Speech Licensing by the Attorney General is Unconstitutional

By effectively requiring charitable organizations to apply for and receive a *de facto* speech permit before soliciting, the Attorney General's new policy violates Plaintiffs' First Amendment free speech and associational rights. The United States Supreme Court has struck bans on solicitation like the one that could be imposed by New York's Attorney General, and has long recognized that solicitations of donations by a non-profit corporation fall squarely within the protections afforded by the First Amendment: "The First Amendment protects the right to engage in charitable solicitation." *Illinois ex rel. Madigan v. Telemarketing Assocs.*, 538 U.S. 600, 611 (2003). Such protection is not new. As the Court made clear in *Thomas v. Collins*, 323 U.S. 516 (1945), such advocacy receives judicial protection even if the solicitation of funds was involved: Solicitation and speech [are] so intertwined that a prior permit could not be required." *Village of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 631 (1980) (citing *Collins*, 323 U.S. at 538).

*Schaumburg* held unconstitutional an ordinance that barred solicitation by charitable organizations that had failed to meet an arbitrary, fixed limit on administrative expenses. *Id.* at 622. A group whose primary purpose was to disseminate information and advocate for environmental causes sought relief from the local permit obligation where failure to comply resulted in a ban on solicitation. *Id.* at 623-25. Turing aside the interests of protection from fraud, invasion of privacy, and preservation of public safety, the Court applied strict scrutiny and held that the permit requirement bore an insufficient relation to the purported governmental interests. The Court emphasized that "organizations whose primary purpose is not to provide money or services for the poor, the needy or other worthy objects of charity, but to gather and disseminate information about

and advocate positions on matters of public concern" are distinguishable from the "more traditional charitable organizations," since the former "characteristically use paid solicitors who necessarily combine the solicitation of financial support with the functions of information dissemination, discussion, and advocacy of public issues." *Id.* at 635 (internal quotation marks omitted).[1]

That the ordinance at issue in *Schaumburg* concerned a requirement regarding salaries and administrative expenses, whereas the New York rule requires the submission of a group's donors, is of no distinguishing consequence.  In both cases, failure to gain the government's pre-approval could result in a ban on speech.[2]  Like in *Schaumburg*, Plaintiffs do not merely solicit funds; instead, they engage in advocacy regarding issues of public import, and ask for financial support to further that advocacy.  Bossie Affidavit at ¶¶ 14-18.  The Attorney General's new policy harkens back to 16th and 17th century speech licensing laws of the sort forbidden by the First Amendment.  *See Citizens United v. FEC*, 558 U.S. 310, 335 (2010) (comparing governmental regulation of political speech to prior centuries' speech licenses).  Plaintiffs do not need such permission to speak.

### 2.  The Attorney General Lacks a Compelling Interest For His Policy

*Schaumburg* makes clear that a governmental entity must satisfy the heavy burden of proving the necessity of regulating charitable solicitation to protect compelling governmental interests.  444 U.S. at 636.  The Attorney General cannot do this, and certainly cannot hide behind some imagined

---

[1] The statute may not reach Plaintiffs at all, since Article 7-A's definition of charitable organizations ought not extend to efforts to influence government policy.  *Green v. Javits*, 7 Misc. 2d 312, 314, 166 N.Y.S.2d 198, 201 (Sup. Ct. 1957) *aff'd sub nom. People v. Green*, 4 A.D.2d 869, 167 N.Y.S.2d 431 (1957) and *aff'd sub nom. Green v. Lefkowitz*, 4 A.D.2d 869, 167 N.Y.S.2d 431 (1957).  In addition to acting beyond statutory authority, the Attorney General's overreach creates unconstitutional vagueness and overbreadth.  *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 392 (1992) ("St. Paul has no such authority to license one side of a debate to fight freestyle, while requiring the other to follow Marquess of Queensberry rules.").

[2] *Compare id.* at 623 (noting that failure to abide by the ordinance left an organization prohibited from soliciting), *with* N.Y. Exec. Law § 177(2) (as currently read by the Attorney General, providing the same for organizations that fail to submit Schedule B).

presumption of constitutional legitimacy or amorphous state power.  On the contrary, the Court's statement in *Schaumburg* that charitable solicitation involves more than commercial speech, *id.* at 632, combined with the Court's later holding that even purely commercial speech merits First Amendment protection, repudiates any such presumption.  *See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 761 (1976) ("[S]peech does not lose its First Amendment protection because money is spent to project it, as in a paid advertisement of one form or another.").  Any such presumptive justification "represents a far too limited view . . . relevant to canvassing and soliciting by religious and charitable organizations."  *Schaumburg*, 444 U.S. at 628.

> Frauds may be denounced as offenses and punished by law.  Trespasses may similarly be forbidden.  If it is said that these means are less efficient and convenient than [deciding in advance] what information may be disseminated from house to house, and who may impart the information, the answer is that considerations of this sort do not empower a municipality to abridge freedom of speech and press.

*Schneider v. State*, 308 U.S. 147, 164 (1939).

Given that Federal law provides a method by which New York can obtain a copy of Schedule B from the IRS, it is hard to see what interest the Attorney General has in now demanding it directly from private persons.  Certainly, New York cannot assert an interest in public disclosure, as the Bureau claims that Schedule B will remain confidential.  *See* NY Charities Bureau, Summary of Annual Filing Requirements (July 18, 2013) at 2 (stating that "the Charities Bureau does not disclose Schedule B to the Public").  Nor is the Attorney General targeting just New York activity; he is demanding Schedule B in its entirety.[3]  Nor can the Attorney General claim this merely concerns the propriety of charitable solicitations.  The Attorney General lacks a compelling interest.

---

[3] Even if the Attorney General is only targeting New York donors, such actions would still be unconstitutional.

### 3.   The Attorney General's New Policy Lacks the Requisite Tailoring

Just as was the case in *Schaumburg*, any "legitimate interest in preventing fraud can be better served by measures less intrusive than a direct prohibition on solicitation." 444 U.S. at 637. As the Court noted, "[f]raudulent misrepresentations can be prohibited and the penal laws used to punish such conduct directly." *Id.* After all, the Court has upheld the ability of states to pursue fraud actions directly. *See Illinois ex rel. Madigan*, 538 U.S. at 606. But the Attorney General has chosen to forego the constitutional scalpel in lieu of an unconstitutional meat cleaver. The New York Attorney General cannot force Plaintiffs to steer clear of a forbidden zone and then claim that they are free to advocate its views, sans solicitation. *See FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 477 n.9 (2007) (rejecting notion that one can still speak merely by changing what is said so as to avoid the offending language) (*citing Cohen v. California*, 403 U.S. 15 (1971) and *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996)). Because the Attorney General's Charities Bureau has not chosen the least intrusive method for vindicating its interests, its policy requiring Plaintiffs to submit copies of Schedule B prior to speaking violates the First Amendment. *See Illinois ex rel. Madigan*, 538 U.S. at 620 (holding that direct actions against fraudulent charities are preferable because "the State bears the full burden of proof" to prohibit the speech rather than the speaker bearing the burden to justify its speech).

### 4.   The Attorney General Forces an Unconstitutional Choice Between Which Rights to Forego, and Is Premised Upon an Unbridled Grant of Authority

#### a.   Plaintiffs cannot be forced to choose between Constitutional protections

In order to speak, New York demands that Plaintiffs must not only register before speaking, but must also relinquish other First Amendment protections, specifically providing the state its private donor list without sufficient assurances regarding confidentiality. The Supreme Court has made clear that the First Amendment protects an organization's interest in the privacy of its members. *NAACP v. Alabama*, 357 U.S. 449, 462 (1958) ("It is hardly a novel perception that

compelled disclosure of affiliation with groups engaged in advocacy may constitute [an] effective . . . restraint on freedom of association."). Likewise, the state cannot require the identification of the people who prepared, sponsored, or distributed communications as a condition of permitting their public distribution. *Talley v. California*, 362 U.S. 60, 65 (1960); *see also McIntyre v. Ohio*, 514 U.S. 334 (1995) (statute prohibiting distribution of handbills without sponsorship disclaimers unconstitutional). Thus, an organization's donor information is private, highly sensitive information that cannot be demanded by government authorities without a compelling justification. *See Buckley v. Valeo*, 424 U.S. 1, 66 (1976) (per curiam) (holding that the disclosure of donor information implicates the First Amendment because "[f]inancial transactions can reveal much about a person's activities, associations, and beliefs.").

Federal law explicitly codifies this principle by requiring that the names and addresses contained on Schedule B remain confidential. 26 U.S.C. § 6104(d)(3)(A). Indeed, the IRS warns non-profit organizations to refrain from unnecessarily providing their Schedule B to states because states "might inadvertently make the schedule available for public inspection." IRS Form 990 Schedule B, General Instructions at 5. The privacy of donor information is so universally accepted that a non-profit organization's privacy policy is considered by outside evaluators in grading an organization's governance. *See* National Council of Nonprofits, *Ethics & Accountability in the Nonprofit Sector*, *available at* http://www.councilofnonprofits.org/resources/resources-topic/ethics-accountability (last visited on May 12, 2014).

Critically, any claim by the Attorney General that donor information will remain confidential rings hollow. Whether such information, if submitted in the way demanded, is subject to New York public records law is murky at best. *Compare* NY Charities Bureau, Summary of Annual Filing Requirements (July 18, 2013) at 2 (promising that "the Charities Bureau does not disclose Schedule B to the Public"), *with Capital Newspapers Div. of Hearst Corp. v. Burns*, 67 N.Y.2d 562, 567 (1986)

(holding that, because the language of the Freedom of Information Law's exceptions is permissive rather than mandatory, "it is within the agency's discretion to disclose such records . . . if it so chooses"), *and Wash. Post Co. v. N.Y. State Ins. Dep't*, 61 N.Y.2d 557, 565 (1984) (holding that an agency's "long-standing promise of confidentiality . . . is irrelevant to whether the requested documents" may be released to the public under a freedom of information request).

The new, across-the-board request for all 501(c)(4)s and 501(c)(3)s to file their Schedule B with the State potentially pierces the longstanding privacy shield that protects such information. Hence, the Attorney General's impermissible demand: risk forgoing the protections recognized in *NAACP* and *Talley*, or else forgo the First Amendment right to solicit recognized by the Court in *Schaumburg*. A speaker cannot be forced to choose between constitutional protections and forgo some rights so as to exercise others. *See Davis v. FEC*, 554 U.S. 724, 738-39 (2008). This impermissible choice becomes all the more offensive with respect to Citizens United, which has already been determined to be a media entity under federal law, and exempt from various federal election reporting requirements. *See* Federal Election Commission Advisory Opinion 2010-08. *See also Near v. Minnesota*, 283 U.S. 697 (1931) (holding statute that permitted county attorney to prohibit publication of certain news articles to be unconstitutional prior restraint); *N.Y. Times v. U.S.*, 403 U.S. 713 (1971) (executive could not prohibit publication even by claiming "classified information" would be disclosed). The Attorney General cannot force such an unconstitutional Catch-22.

### b.  The Attorney General cannot have unfettered discretion as to policies adversely impacting Constitutional rights

A bedrock principle of First Amendment jurisprudence is that a government official may not be granted unbridled discretion in making rules governing the exercise of protected free speech. As the Supreme Court observed in *City of Lakewood*, 486 U.S. at 770, a licensing scheme that vests a government official with unbridled discretion to grant or deny a permit violates the First Amendment. Limits on the official's discretion must be "made explicit by textual incorporation,

binding judicial or administrative construction, or well-established practice." *Id.*  *See also Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 131 (1992) ("'a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license' must contain 'narrow, objective, and definite standards to guide the licensing authority'" (quoting *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150-151 (1969))); *Staub v. City of Baxley*, 355 U.S. 313, 322 (1958) (the First Amendment may not be conditioned on "the uncontrolled will of an official – as by requiring a permit or license which may be granted or withheld in the discretion of such official").[4]

This bedrock principle is fully applicable to state or local charitable solicitation statutes and ordinances.  For example, the Tenth Circuit struck down a section of Utah's charitable solicitation statute that allowed the Director of Division of Consumer Protection to: (a) deny, suspend or revoke an application, registration or permit if the director finds that such action serves the "public interest" and (b) granted director authority to request "any additional information the division may require."  *See Am. Target Adver.*, 199 F.3d at 1250-1253.  Similarly, a district court applied the same principle in *Public Citizen, Inc. v. Pinellas County*, 321 F. Supp. 2d 1275 (M.D. Fla. 2004), and struck down a county charitable solicitation ordinance that granted the Director of the county's Department of Justice and Consumer Services authority to "promulgate the forms deemed necessary to carry out his or her responsibilities" without imposing limits on the director's discretion.  *Id.* at 1284.

Here, the Attorney General claims to rely on his general authority to prescribe forms and "make rules and regulations necessary of the administration" of New York State's "Solicitation and

---

[4] As Justice Thurgood Marshall observed, the threat of such *ad hoc* power "hangs over [a speaker's] head[] like a sword of Damocles . . . .  That th[e] Court will ultimately vindicate [him] if his speech is constitutionally protected is of little consequence – for the value of a sword of Damocles is that it hangs – not that it drops."  *Arnett v. Kennedy*, 416 U.S. 134, 231 (1974) (Marshall, J., dissenting).

Collection of Funds for Charitable Purposes Law" to impose new, unconstitutional requirements. The statute states that a registered organization with annual receipts in excess of $250,000 "shall file with the attorney general an annual written financial report, on forms prescribed by the attorney general." N.Y. Exec. Law § 172-b(1). The statute further confers on the Attorney General the power to "make rules and regulations necessary for the administration" of the statute. N.Y. Exec. Law § 177(1). He is to develop a single set of reporting forms that may also be used for filings under the state's Estates, Powers and Trusts Law, and "avoid duplication with and make maximum use of information required in federal reporting forms." N.Y. Exec. Law § 172(10). The Attorney General apparently does not read such instructions as placing any limit whatsoever on the substance of what he can unilaterally require to be disclosed as a pre-condition to the exercise of First Amendment rights in New York. In the hands of the Attorney General, the statute confers unbridled discretion for him to require virtually any information that he so desires as a precondition to the exercise of First Amendment rights.

The statutory provision at issue here is identical in substance to the statutory provision at issue in *Public Citizen*, where a court struck down not only the statutory provision but the entire regulatory scheme on the grounds that the unconstitutional provision was not severable from the rest of the statutory scheme. *See Public Citizen*, 321 F. Supp. 2d at 1308-09. As that court explained:

> [T]he ordinance . . . grants the director authority to "promulgate the forms deemed necessary to carry out his or her responsibilities," insufficiently limits the director's discretion. [The ordinance] enables the director's promulgation of application forms that request an expansive and forbidding quantity of information not authorized by the ordinance and, consequently, lacks the precise and clear standards compelled by the First Amendment.

*Id.* at 1292-93 (citing *American Target*, 199 F.3d at 1251 & 1252 n.3 (a solicitation ordinance that grants the decisionmaker authority to request "any additional information" confers "unconstitutional discretion . . . because it presumes that [the decisionmaker] . . . will use her blanket authority to request additional information only in good faith and consistent with implicit standards")). The

Attorney General's claimed power is equally unbounded, and just as was the case in *Public Citizen*, renders the underlying statute unconstitutional.[5]   Accordingly, this Court should issue an injunction.

## B. The Attorney General's New Policy Violates the Due Process Clause and New York Administrative Law.

### 1. The New Policy Lacks the Sort of Prior Notice That Due Process Demands

The Attorney General's new policy runs afoul of due process.   In *FCC v. Fox Television Stations, Inc.*, the Supreme Court held that the Federal Communications Commission had violated television broadcasters' due process rights by (1) changing its policy for enforcing obscenity regulations without giving prior notice, and (2) enforcing this new policy after years of not enforcing obscenity regulations against "fleeting expletives."   132 S. Ct. at 2317-20.   Regulations must be clear and consistently enforced so that regulated parties know what is expected of them and to prevent arbitrary and discriminatory enforcement: "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech."   *Id.*

Here, the Charities Bureau has begun to demand charitable organizations turn over Schedule B after not requiring such disclosure for years.   This sudden change of position implicates both concerns elucidated by the Court.   First, until sending deficiency notices to Plaintiffs, the Bureau had not indicated that it read the 2006 regulations to require Schedule B.   Second, even if the Attorney General asserts that his interpretation is proper, he has not enforced it for over six years.   Such abrupt changes in the interpretation or enforcement of regulations are particularly suspect where, as here, those "regulations . . . touch upon sensitive areas of basic First Amendment freedoms."   *Id.* at

---

[5] That the Attorney General has completely ignored any consideration of the constitutional harm caused by his action only compounds the problem, since the exercise of even validly conferred discretion must avoid such serious constitutional doubt.   *Arizona v. Inter-Tribal Council of Ariz.*, 133 S. Ct. 2247, 2259 (2013) ("That is because we think that – by analogy to the rule of statutory interpretation that avoids questionable constitutionality – validly conferred discretionary executive authority is properly exercised . . . to avoid serious constitutional doubt.").   *See also Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) (*Chevron* deference does not apply "where an otherwise acceptable construction of a statute would raise serious constitutional problems.").

2318 (internal quotation marks removed).  Such changes create an "obvious chilling effect."[6]  *Id.* The sudden change of heart leaves Plaintiffs to face penalties for non-compliance with a regulatory provision that either (1) had a different interpretation, or (2) went unenforced at the time of the conduct in question.  This violates the Fourteenth Amendment's guarantee of due process.[7]

### 2.  The Attorney General Failed to Provide Notice and Comment

The new mandate violates the New York State Administrative Procedure Act ("SAPA"). New York law defines a "rule" as "the whole or part of each agency statement, regulation or code of general applicability that implements or applies law, or prescribes a fee charged by or paid to any agency or the procedure or practice requirements of any agency, including the amendment, suspension or repeal thereof."  N.Y. SAPA § 102(2)(a).  Agencies include "any department, board, bureau, commission, division, office, council, committee or officer of the state."  *Id.* § 102(1).  All agencies must use notice-and-comment procedures before promulgation of a rule.  *Id.* § 202(1)(a). Any "fixed, general principle to be applied by an administrative agency without regard to the other facts and circumstances relevant to the regulatory scheme of the statute it administers" must be adopted as a rule.  *Car Barn Flats Residents' Ass'n v. N.Y. State Div. of Hous. & Cmty. Renewal*, 184 Misc. 2d 826, 831 (N.Y. Sup. Ct. 2000) (quoting *Roman Catholic Diocese v. N.Y. State Dep't of Health*, 66 N.Y.2d 948, 951 (1985) (memorandum op.)); *see also Schwartfigure v. Hartnett*, 83 N.Y.2d 296, 301 (1994) (holding that rules include "rigid . . . polic[ies] invariably applied across-the-board to all

---

[6] Worse, the New York Attorney General sprung his new requirement regarding the submission of Plaintiffs' donors <u>after</u> such donors had given, donors who had already been assured of and relied upon confidentiality.

[7] Similarly, the reputational stigma that would endure should the Attorney General elect to pursue Plaintiffs creates a separate due process problem.  *See generally Wisconsin v. Constantineau*, 400 U.S. 433, 436 (1971) (holding that prior to taking action that would expose an individual to public embarrassment and ridicule, "it is our opinion that procedural due process requires that before one acting pursuant to State statute can make such a quasijudicial determination, the individual involved must be given notice of the intent to [take such action] and an opportunity to present his side of the matter.").

claimants without regard to individualized circumstances or mitigating factors"). If a policy "directly and significantly affects that segment of the public over which [the agency] exercises direct authority," then notice-and-comment procedures are mandatory. *Id.* at 302.

The current regulation, enacted in 2006, provides that covered charitable organizations must file "a copy of the complete IRS Form 990, 990-EZ, or 990-PF with schedules" with the Attorney General. 13 NYCRR § 91.5(c)(3)(i)(a). The 2006 rule removed the prior rule's direct reference to Schedule B. *See id.* § 92.3(b)(2) (2003) (explicitly requiring "Schedules A and B and any other schedules or statements . . . to be attached"). Consistent with its plain text and established New York canons of construction,[8] the Bureau took this 2006 regulatory change in language to be substantive: Until recently, it did not require covered charitable organizations to submit copies of IRS Schedule B. Despite no change to the underlying regulatory text since 2006, Plaintiffs recently received deficiency notices, and Plaintiffs are unable to even ascertain when the change occurred.

SAPA is clear that any "amendment" to a rule requires notice-and-comment to be valid. N.Y. SAPA § 102(2)(a). The requirement that all (c)(4)s and (c)(3)s file unredacted copies of Schedule B is a rigid, across-the-board policy. *See Schwartfigure*, 83 N.Y.2d at 301 (holding that

---

[8] Critically, under the plain language of New York law, the regulation does not require groups such as Plaintiffs to include all related schedules when filing in New York. Instead, the regulation only requires schedules to be filed by those who file Form 990-PF, *i.e.*, private foundations, to wit: "a copy of the complete IRS Form 990, 990-EZ, or *990-PF with schedules.*" 13 NYCRR § 91.5(c)(3)(i)(a) (emphasis added). This is because under well-established canons of construction recognized in New York, the phrase "with schedules" applies only to the last antecedent, meaning Form 990-PF. *See Long v. Adirondack Park Agency*, 76 N.Y.2d 416, 424 (1990) (when interpreting a text, a modifier must be construed to apply only to the last antecedent); *Duane Reade, Inc. v. Cardtronics, LP*, 54 A.D.3d 137, 141 (N.Y. App. Div. 2008) (same); *DaimlerChrysler Corp. v. Spitzer*, 26 A.D.3d 88, 91 (N.Y. App. Div. 2005) (same); *Remba v. Fed'n Emp't & Guidance Serv.*, 149 A.D.2d 131, 137 (N.Y. App. Div. 1989) (same); *Barclay Knitwear Co. v. Kingswear Enter.*, Ltd., 141 A.D.2d 241, 247 (N.Y. App. Div. 1988) (same); *Connors v. Hartford Fire Ins. Co.*, 138 A.D.2d 877, 879 (N.Y. App. Div. 1988) (same). This reading makes perfect sense when viewed through the lens of federal law as well, since donors to private foundations are made public. *See* 26 U.S.C. § 6104(d)(3)(A) (requiring only private foundations (unlike other section 501(c)(3) and (c)(4) organizations such as Plaintiffs) to make their donors publicly known). Since neither Plaintiff is a private foundation, and neither file Form 990-PF, New York law does not require Plaintiffs to submit Schedule B to New York. Thus, the Attorney General and his Charities Bureau lack the authority to require Schedule B of Plaintiffs.

policies "invariably applied across-the-board to all claimants" must be adopted through formal rulemaking procedures). It "directly and significantly affects the segments of the public over which [the Attorney General] exercises direct authority" — charitable organizations. *See id.* at 302 (requiring such actions to be promulgated as rules). The policy represents a change from the original 2006 interpretation of the regulation. *See Richardson v. Comm'r of N.Y. City Dep't of Soc. Servs.*, 88 N.Y.2d 35, 39 (1996) ("Absent a reasoned explanation for abandonment of the . . . expressed original reading of the regulation at the time of promulgation . . . the agency's change of position [is] arbitrary and capricious and cannot stand."). Since these proper procedures to adopt this change in policy were not followed, Plaintiffs cannot be required to submit copies of Schedule B.

### C. The Attorney General's New Policy is Preempted by Federal Law.

The Attorney General's policy of now requiring Plaintiffs to submit Schedule B not only violates the Constitution and state statutory law, but conflicts with federal statutory law. Federal law provides for a specific procedure through which the Attorney General may gain access to federal tax information "for the purpose of, and only to the extent necessary in, the administration of State laws regulating the solicitation or administration of . . . charitable funds or charitable assets." 26 U.S.C. § 6104(c)(3). By submitting a written request to the Secretary of the Treasury, the Attorney General can have access to the information it claims to need subject to the strict privacy protections federal law provides to prevent the inadvertent release of confidential donor information. *Id.* Federal law therefore allows the Attorney General to achieve its professed goal while reducing the likelihood that donors' protected privacy interests will be violated.

#### 1. The Supreme Court has recognized the sort of preemption present here

The Supreme Court has recognized three means of preemption, including conflict preemption. *Mich. Canners & Freezers Ass'n v. Agric. Mktg. & Bargaining Bd.*, 467 U.S. 461, 469

(1984).[9]  Conflict preemption requires a court to analyze the "structure and purpose of the statute as a whole."  *Gade v. Nat'l Solid Wastes Mgm't Ass'n*, 505 U.S. 88, 98 (1992) (O'Connor, J., for the Court).  The court is not "guided by a single sentence or member of a sentence."  *Id.* at 99.  Instead, it examines the "balance of interests" Congress struck, *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 495 (1987); the "theme[s]" Congress emphasized, *Mich. Canners*, 467 U.S. at 471; and the remedies Congress made available.  *Wis. Dep't of Indus., Labor, & Human Relations v. Gould, Inc.*, 475 U.S. 282, 287 (1986).  Any state law that "frustrates the full effectiveness of federal law is rendered invalid by the Supremacy Clause."  *Gade*, 505 U.S. at 105 (1992) (quoting *Perez v. Campbell*, 402 U.S. 637, 652 (1971)).  That the goals of the federal and state laws are the same is irrelevant if the state statute "interferes with the methods by which the federal statute was designed to reach [its] goal."  *Int'l Paper*, 479 U.S. at 494.  Conflict preemption occurs not only when it is impossible to abide by both the state and federal enactments but also when "state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"  *Id.* (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).  Together with field preemption, conflict preemption is also known as "implied pre-emption."  *Gade*, 505 U.S. at 98 (plurality opinion).

The Supreme Court has found multiple state laws preempted under conflict analysis despite the absence of an express preemption clause.  In *Michigan Canners*, both the federal and state laws at issue were designed to give farmers more bargaining power in negotiations with purchasers.  467 U.S. at 477.  However, the Michigan law required all farmers to join an agriculture marketing association if a majority of the producers of their commodity joined.  *Id.* at 466-68.  The Supreme

---

[9] First, Congress may preempt state law with an express clause defining the preemptive reach of the statute.  *Id.*  Second, Congress may choose to "occupy the field" by enacting a set of regulations so comprehensive courts determine that it was Congress's intent to oust state jurisdiction entirely.  *Id.*  Finally, state laws will be preempted where they conflict with federal laws.  *Id.*

Court found that Michigan's statute interfered with the "theme of voluntariness" found in the federal statute, which permitted farmers to choose whether to join marketing associations. The Justices held that this "theme" preempted the Michigan statute despite the federal statute's containing a clause stating that it "shall not be construed to change or modify existing State law." *Id.* at 469 (quoting 7 U.S.C. § 2305(d)).

Similarly, in *International Paper v. Ouellette*, the Supreme Court determined that the Clean Water Act preempted a nuisance lawsuit filed by residents of Vermont under Vermont common law against a paper plant located across Lake Champlain in New York. 479 U.S. at 500. Examining the goals, policy, and history of the Act, the Court noted that the Clean Water Act established a comprehensive system for regulating interstate water pollution, including levying criminal and civil penalties. *Id.* at 490-92. Because affected states would have a greater role in the process than Congress envisioned when passing the Act, this would "disrupt [the] balance of interests" struck by Congress between source states and affected states, the Supreme Court held that the lawsuit was preempted. *Id.* (finding that "[i]t would be extraordinary for Congress . . . to tolerate common-law suits that have the potential to undermine [the] regulatory structure," *id.* at 497). The saving clause, that "[n]othing in this section shall restrict any right [a person] may have under any statute or common law" could not save the lawsuit. *See* 33 U.S.C. § 1365(e); *Int'l Paper*, 479 U.S. at 493.

### 2.  The Attorney General is in conflict with Federal law

Here, federal law establishes a general rule of non-disclosure of tax information. 26 U.S.C. § 6103(a); *see also* S. Rep. No. 91-552 (1969), *reprinted in* 1969 U.S.C.C.A.N. 2027, 2081 (explaining that Congress altered the original bill to provide for donor privacy "because some donors prefer to give anonymously. To require public disclosure in these cases might prevent the gifts."). It also establishes a comprehensive system regulating the disclosure of that information to both federal and state officials. *Compare* 26 U.S.C. §§ 6103-6104 (regulating the disclosure of tax information), *with*

*Int'l Paper*, 479 U.S. at 490-92 (finding preemption, in part, because of the comprehensive nature of the federal regulatory regime).  Violation of federal law's privacy protections can lead to civil or criminal felony penalties.  *Compare* 26 U.S.C. §§ 6103 and 7213 (establishing penalties for unlawful disclosure), *with Int'l Paper*, 479 U.S. at 492 (finding preemption, in part, because of range of civil and criminal penalties federal law provides for violations), *and Gould*, 475 U.S. at 287 (holding that federal law should control the "range and nature of [the] remedies . . . available").  Federal law even provides a specific method for state officials such as the Attorney General to request federal tax information as part of their duties "regulating the solicitation or administration of . . . charitable funds."  26 U.S.C. § 6104(c)(3).  The presence of a specific method for requesting such information further supports the preemption of state regulations that seek to circumvent it.  *See Gould*, 475 U.S. at 286 (noting that "conflict is imminent whenever two separate remedies are brought to bear on the same activity" (internal quotation marks omitted)).  Because the Bureau's new policy is nothing more than an end-run around the approved federal statutory process for the receipt of tax information by state officials (including Felony penalties for its release), it is preempted and unenforceable.[10]

## II.  THE NEW POLICY IRREPARABLY HARMS PLAINTIFFS BY BANNING SOLICITATONS AND POLITICAL SPEECH

At issue is the quintessential form of irreparable harm:  "The loss of First Amendment freedoms, *for even minimal periods of time*, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion) (emphasis added); *accord N.Y. Progress & Prot. PAC*, 733

---

[10] To be clear, Plaintiffs' concern is not limited to a fear that the Attorney General might make public their confidential donor information.  In fact, absent following federal law, the Attorney General ought to be precluded from obtaining the information, even if kept confidential.  The Supreme Court has made clear that an organization's interest in the privacy of its members is protected by the First Amendment.  *See Davis v. FEC*, 554 U.S. at 744 ("[W]e have repeatedly found that compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment." (*quoting Buckley*, 424 U.S. at 64)).

F.3d at 486.[11]  In addition to submitting form CHAR 500 to the Bureau annually under 13 NYCRR §

91.5(c), the Attorney General's new policy now adds as a requirement that Plaintiffs also must turn

over their list of non-public donors — regardless of whether they are residents of New York — or

face a prohibition on any solicitation activities.  N.Y. Exec. Law § 172-b(5).  Plaintiffs also face steep

civil penalties of $1,000 per violation and up to $100 per day for noncompliance with the

registration requirements.  *Id.* § 177(2)(b).  New York law is clear that the Attorney General has the

power to revoke, suspend, or deny Plaintiffs' registration for refusing to abide by his newly-minted

policy requiring the submission of Schedule B.  *Id.* § 177(2)(a).  Such a ban constitutes irreparably

harm.  *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 301 (D.C. Cir. 2006) ("Where a

plaintiff alleges injury from a rule or regulation that directly limits speech, the irreparable nature of

the harm may be presumed" (quoting *Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342, 350 (2d

Cir. 2003)).[12]

If Plaintiffs are to have their voices heard, they cannot spend the next several months in

limbo while the Bureau ponders the enforcement of its new policy requiring groups to give up their

members' and supporters' privacy in order to earn the right to speak.  It necessarily goes without

saying that monetary damages cannot compensate Plaintiffs for their injury.  Nor will relief many

months down the road be adequate.  When attempting to influence the government's policy choice,

---

[11] *See also Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009) ("The harm is particularly irreparable where, as here, a plaintiff seeks to engage in political speech, as timing is of the essence in politics *and a delay of even a day or two may be intolerable.*") (emphasis added) (internal quotation marks omitted); *Stahl v. City of St. Louis*, 687 F.3d 1038, 1041 (8th Cir. 2012) ("Speech is an activity particularly susceptible to being chilled" and that chill "disproportionately hurt[s] those who espouse unpopular or controversial beliefs."); *Summum v. Pleasant Grove City*, 483 F.3d 1044, 1056 (10th Cir. 2007) (*quoting Elrod v. Burns*, 427 U.S. 347, 373 (1976)) ("Deprivations of speech rights presumptively constitute irreparable harm for purposes of preliminary injunction: 'The loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury.'").

[12] *See also Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290, 299 (1981) ("Placing limits on contributions which in turn limit expenditures plainly impairs freedom of expression."); *Buckley*, 424 U.S. at 65-66 (holding that the right to associate "is diluted if it does not include the right to pool money through contributions, for funds are often essential if 'advocacy' is to be truly or optimally 'effective.'").

every day is vital.  *See Klein*, 584 F.3d at 1208 (holding that, regarding political speech, even a day's delay is "intolerable").  That lost time cannot be restored, as there is "no means to make up for the irretrievable loss of that which would have been expressed."  *414 Theater Corp. v. Murphy*, 499 F.2d 1155, 1160 (2d Cir. 1974).  Absent a preliminary injunction, Plaintiffs will be irreparably harmed, and will not be able to solicit and thereby speak and otherwise raise sufficient funds to support their messages, during what ought to be a robust issue discussion this year and beyond.

## III.   THE BALANCE OF EQUITIES TIPS DECIDEDLY IN PLAINITFFS' FAVOR

Even if Plaintiffs did not have such a strong likelihood of success on the merits, they would still be entitled to a preliminary injunction.  Self-censorship is "a harm that can be realized even without actual prosecution."  *Virginia v. Am. Bookseller's Ass'n*, 484 U.S. 383, 393 (1988).  "Deprivations of speech rights presumptively constitute irreparable harm for purposes of preliminary injunction: 'The loss of First Amendment freedoms, even for minimal periods of time, constitutes irreparable injury.'"  *Summum v. Pleasant Grove City*, 483 F.3d 1044, 1056 (10th Cir. 2007) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).  The Supreme Court made clear that in any conflict between First Amendment rights and regulation, courts "must give the benefit of any doubt to protecting rather than stifling speech," and that "the tie goes to the speaker, not the censor." *FEC v. Wisc. Right to Life*, 551 U.S. at 469, 474.

On the other side of the balance, the Attorney General cannot point to any harm to it or the public that would result from this Court's granting a preliminary injunction.  *See Random House*, 283 F.3d at 491 (holding that a preliminary injunction must be issued, even where there is not a likelihood of success, if (1) "sufficiently serious questions" are raised and (2) the balance of hardships tips "decidedly in the movant's favor").  New York "does not have an interest in the enforcement of an unconstitutional" or otherwise illegal law. *Am. Civil Liberties Union v. Ashcroft*, 322 F.3d 240, 247 (3d Cir. 2003), *aff'd*, 542 U.S. 656 (2004) (internal quotation marks omitted).  Rather,

"[t]he public interest is better served by following binding Supreme Court precedent and protecting the core First Amendment right of political expression." *Homans v. City of Albuquerque*, 264 F.3d 1240, 1244 (10th Cir. 2001) (per curiam). *See also Mich. Chamber of Commerce v. Land*, 725 F. Supp. 2d 665, 698 (W.D. Mich. 2010) (the public interest "always strongly favors the vindication of constitutional rights and the invalidation of any state action which infringes on those rights or chills their confident and unfettered exercise").

In the unlikely event that this Court were to issue a preliminary injunction but later conclude that Plaintiffs' claims failed on the merits, neither the Attorney General nor the public would suffer any harm. The Attorney General can make no argument that requiring charitable organizations to file Schedule B with the Bureau serves a public informational interest, as the Bureau does not purport to make Schedule B public information. *See* NY Attorney General's Charities Bureau, Summary of Annual Filing Requirements (July 18, 2013) at 2. Likewise, there can be no assertion that requiring Plaintiffs to disclose their Schedule B can prevent actual or potential *quid pro quo* corruption, since such independent speech "do[es] not give rise to corruption or the appearance of corruption." *Citizens United*, 558 U.S. at 357. Nor will an injunction will not impede the Attorney General's ability to police charitable organizations. Federal law provides a mechanism whereby the Attorney General or his designee can request the necessary information as a part of his duties "regulating the solicitation or administration of . . . charitable funds." 26 U.S.C. § 6104(c)(3). When state officers request information through the official channel provided by Section 6104(c)(3), federal law protects donors from having their information inadvertently released. *See id.* § 6103(a)(2) (providing that "no officer or employee of any State . . . who has or had access to returns or return information under . . . section 6104(c)" may disclose that donor information). That same protection arguably does not apply to information gained outside official channels. *See id.* (protecting only information gained "under . . . section 6104(c)"). The Bureau's promises not to release a Schedule B

22

submitted with form CHAR 500 are thus meaningless, and do not alleviate the unconstitutional chill of its demands.

Absent the requested injunction, the Attorney General appears to be legally free to release the donor information contained on Schedule B to the public — and thereby irreparably chill donors' willingness to give and irreparably curtail Plaintiffs' ability to speak — without repercussion. Critically, the Bureau appears to be evading federal law's privacy protections, and New York courts have held repeatedly that agency promises of confidentiality cannot shield information from release under the state's Freedom of Information Law.  In other words, the Attorney General is end-running the potential felony penalties under federal law that ought to follow the public release of Schedule B.  *See* 26 U.S.C. §§ 6103, 7213.  With an injunction, the Attorney General still may have access to the information he claims to now need, but subject to federal penalties for disclosure.  *See* 26 U.S.C. § 6103(a)(2).  Such penalties ensure the sort of confidentiality decreed by Congress, which recognized that the possible public disclosure might prevent donors from exercising their own constitutional rights.  S. Rep. No. 91-552 (1969), *reprinted in* 1969 U.S.C.C.A.N. 2027, 2081.

Plaintiffs are therefore the only parties that can suffer harm here.  The Attorney General and the public will suffer no harm, and the Attorney General's ability to police charitable organizations' compliance with the law will remain unimpeded.  Even if Plaintiffs did not have such a strong likelihood of success, they have demonstrated "sufficiently serious questions going to the merits to make them a fair ground for litigation and [the] balance of hardships tip[s] decidedly in [Plaintiffs'] favor."  *Random House*, 283 F.3d at 491.  Because an injunction cannot harm either the Defendants or the public, this Court should grant the Motion for a Preliminary Injunction.

## IV.   <u>AN INJUNCTON IS IN THE PUBLIC INTEREST</u>

The final factor to be considered is the public interest.  Considering the importance of the First Amendment and Due Process rights at issue, the public has no interest in seeing Plaintiffs'

speech and associative rights improperly curtailed.  "[T]he public has no interest in the enforcement of laws in an unconstitutional manner."  *L.P. Acquisition Co. v. Tyson*, 772 F.2d 201, 209 (6th Cir. 1985).  On the contrary:

> The preservation of the rights in the Constitution and the legality of the process by which government agencies function certainly weighs heavily in the public interest . . . .  However, the public may be deemed to have an overriding interest in assuring that the government remains within the limit of its constitutional authority.

*Nat'l Treas. Employees Union v. U.S. Dep't of Treas.*, 838 F. Supp. 631, 640 (D.D.C. 1993).  Clearly, "[t]he First Amendment, in particular, serves significant societal interests."  *First Nat'l Bank v. Bellotti*, 435 U.S. 765, 776 (1978).

New York cannot claim harm to the public because potential donors — more secure in the knowledge that the Attorney General will not be collecting their donation information unjustifiably — likely will contribute in greater numbers and greater amounts, making possible more speech and advocacy on the part of Plaintiffs.  The Supreme Court "has long viewed the First Amendment as protecting a marketplace for the clash of different views and conflicting ideas.  That concept has been stated and restated almost since the Constitution was drafted."  *Citizens Against Rent Control*, 454 U.S. at 295.  "[T]here is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of government affairs."  *Mills v. Alabama*, 384 U.S. 214, 218 (1966).  Thus, "speech concerning public affairs is more than self-expression; it is the essence of self-government."  *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964).

The public cannot be harmed by the presence of additional political advocacy that provides more information and further diversifies the viewpoints available in the public arena.  "[T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment, which was designed to secure the widest possible dissemination of information from diverse and antagonistic sources."  *Buckley*, 424 U.S. at 48-49 (internal quotation marks omitted).  The only potential "harm" is more

speech; and that is no harm at all.  *Id.*  On the contrary, "[s]ecuring First Amendment rights is in the public interest," *N.Y. Progress & Prot. PAC*, 733 F.3d at 488, and courts have repeatedly recognized that the vindication of First Amendment rights is a significant public interest.[13]  Thus, the proper balancing tips decidedly in Plaintiffs' favor, and the public interest would be well-served by the issuance of an injunction.

## CONCLUSION

All of the factors weigh in favor of granting Plaintiffs' request for a preliminary injunction. Any doubt must be resolved in favor of Plaintiffs, as the Court "must give the benefit of any doubt to protecting rather than stifling speech."  *FEC v. Wis. Right to Life*, 551 U.S. at 469.  Plaintiffs' motion for a preliminary injunction to enjoin the Attorney General and his Charities Bureau from requiring Plaintiffs to submit their Schedule B, to receive permission to solicit and speak in New York, should therefore be granted.

Dated:  June  16, 2014

Respectfully submitted.

JONES DAY

/s/ Todd. R Geremia

Michael Boos
(*Of counsel*, *pro hac vice application pending*)
General Counsel
Citizens United
Citizens United Foundation
1006 Pennsylvania Ave., S.E.
Washington, DC 20003
Phone:  (202) 547-5240
Facsimile:  (202) 547-5421

Donald F. McGahn (*pro hac vice application pending*)
51 Louisiana Avenue, N.W.
Washington, D.C. 20001

Todd R. Geremia
222 E. 41st Street
New York, NY 10017
Phone: (212) 326-3939
Facsimile: (212) 755-7306

---

[13] *See, e.g., Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) ("[U]pholding constitutional rights surely serves the public interest."); *Christian Legal Society v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006) ("[I]njunctions protecting First Amendment freedoms are always in the public interest."); *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005); *Pacific Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1237 (10th Cir. 2005) ("Vindicating First Amendment freedoms is clearly in the public interest."); *Chabad of Southern Ohio v. City of Cincinnati*, 363 F.3d 427, 436 (6th Cir. 2004) ("[T]he public interest is served by preventing the violation of constitutional rights.").