USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  7/27/2015

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
CITIZENS UNITED and CITIZENS         :
UNITED FOUNDATION,                   :
                                     :
                       Plaintiffs,   :     14-Cv-3703 (SHS)
          -against-                  :
                                     :     OPINION & ORDER
ERIC SCHNEIDERMAN, in his official   :
capacity as New York Attorney General, :
                                     :
                       Defendant.    :
-----------------------------------------------------------x

SIDNEY H. STEIN, U.S. District Judge.

Plaintiffs Citizens United and Citizens United Foundation seek to preliminarily enjoin the New York Attorney General from enforcing his policy of requiring registered charities to disclose the names, addresses, and total contributions of their major donors in order to solicit funds in the state. Plaintiffs contend principally that the policy impermissibly trenches upon their First Amendment rights of freedom of speech and association. They also allege that the policy was adopted in violation of the State Administrative Procedure Act; that it is preempted by federal law; and that the Attorney General's enforcement of the policy violates their due process rights. Because the Court finds that plaintiffs are not likely to succeed on the merits of any of their claims, their motion for a preliminary injunction is denied.

I.  **BACKGROUND**

Citizens United and Citizens United Foundation (collectively, "Citizens United" or "plaintiffs") are nonstock, nonprofit corporations that state they advocate for "limited government, free enterprise, strong families, and national sovereignty and security." (Compl. ¶¶ 9–10.) Citizens United is

organized under 26 U.S.C. § 501(c)(4), while Citizens United Foundation is a section 501(c)(3) organization. (Compl. ¶¶ 9–10.) Plaintiffs promote their agenda through television commercials, web advertisements, and documentary films, and raise money for these and other projects primarily by soliciting donations from like-minded individuals. (*Id.* ¶¶ 17–19.)

The New York Attorney General, through his Charities Bureau, is responsible for supervising more than 65,000 charitable organizations that are registered in New York state. (Decl. of Karin Kunstler Goldman dated July 23, 2014 ("Goldman Decl.") ¶¶ 3–4.) The Charities Bureau oversees the registration of charitable organizations, investigates donor and consumer complaints, ensures that funds and property held for charitable purposes are properly used, and prosecutes violations of New York's charitable registration and solicitation laws. (*Id.* ¶ 3.)

To maintain their tax-exempt and charitable organization statuses, plaintiffs must comply with a number of registration and reporting requirements. Pursuant to federal rules, plaintiffs annually file Form 990 and its accompanying schedules with the Internal Revenue Service ("IRS"). (Compl. ¶ 25.) Schedule B to IRS Form 990, which is at the heart of this litigation, directs organizations to report the name, address, and total contribution of any donor who contributed $5,000 or more in cash or property to the organization during the past year. (*See* Ex. B. to Goldman Decl. at 1.) Pursuant to federal law, the IRS does not make Schedule B to IRS Form 990 available to the public. *See generally* 26 U.S.C. § 6103; (Compl. ¶ 25).

In order to solicit donations in New York, all charitable organizations that are not otherwise exempt—including plaintiffs—must first file a registration form with the Attorney General's Charities Bureau, as required by Article 7-A of the Executive Law. N.Y. Exec. Law § 172(1); 13 NYCRR § 91.4. Each year thereafter, charities must file an annual report form known as CHAR500. N.Y. Exec. Law § 172-b(1); 13 NYCRR § 91.5; (Compl. § 26). In 2006, the Attorney General promulgated a regulation, 13 NYCRR § 91.5, which directs charities to attach "a copy of the complete IRS Form 990,

990-EZ or 990-PF with schedules" to their annual reports. 13 NYCRR § 91.5(c)(3)(i)(a); (Goldman Decl. ¶ 8). The Attorney General interprets section 91.5 to mean that charities that file a copy of IRS Form 990 must also submit that form's Schedule B. (Compl. ¶ 1; *see* Goldman Decl. ¶¶ 8–12.) In other words, section 91.5 serves as the Attorney General's source of legal authority for requiring registered charities to disclose the names, addresses, and total contributions of their major donors, which the Court will refer to as the Attorney General's "Schedule B policy."

Plaintiffs, which first registered as charities in New York in 1995, have never filed copies of their Schedules B with the Attorney General. (Compl. ¶¶ 29, 31.) In 2012, the Charities Bureau conducted a review of its operations and determined that certain organizations were not filing Schedule B along with their annual reports. (Goldman Decl. ¶ 17.) The Attorney General states that he then "implemented an across-the-board initiative to identify and notify registered organizations of their filing deficiencies with respect to Schedule B." (*Id.* ¶ 18.)  In April 2013, the Attorney General notified plaintiffs that their annual reports for tax year 2011 were incomplete due to the absence of Schedule B. (*Id.* ¶ 21.)

Plaintiffs now move for a preliminary injunction prohibiting the Attorney General from enforcing the Schedule B policy against them. They allege that the policy is illegal for four reasons. First, plaintiffs contend that the policy violates their First Amendment rights of freedom of speech and association. They identify two distinct grounds for their First Amendment challenge: (1) that the Attorney General's interests in enforcing the Schedule B policy do not justify the burdens it places on charities' rights of speech and association (the "unconstitutional burden" argument), and (2) that Article 7-A of the Executive Law is an unlawful prior restraint on speech because it confers unbridled discretion on the Attorney General to impose unlimited conditions on charities' ability to speak (the "prior restraint" argument).

Second, plaintiffs argue that the Attorney General's enforcement of the Schedule B policy violates due process. Plaintiffs allege that the Attorney General initially read section 91.5 as not requiring registered charities to submit Schedule B, but then reversed his interpretation without providing notice of his reversal or an opportunity for public comment. Plaintiffs claim that this "abrupt change" violates due process because they lacked fair notice that they were required to file Schedule B in order to solicit donations in New York. (Pls.' Mem. of Law in Supp. of Mot. for Prelim. Inj. ("Pls.' Mem.") at 13; *see also* Pls.' Reply Mem. of Law ("Pls.' Reply") at 8.)

Third, plaintiffs contend that the Attorney General adopted the Schedule B policy in contravention of the New York State Administrative Procedure Act ("SAPA"). Because on plaintiffs' reading the plain text of section 91.5 does not require charities to submit Schedule B with their annual reports, they argue that the Attorney General was obligated to comply with SAPA's formal rulemaking procedures before reaching the opposite conclusion.

Fourth, plaintiffs argue that the Schedule B policy is preempted by federal law, which sets out a mechanism for states to request Schedules B from the IRS and also ensures the confidentiality of donor information. Plaintiffs assert that the Attorney General's policy of obtaining Schedules B directly from charities, rather than requesting them from the IRS, conflicts with these federal statutory provisions.

## II.  DISCUSSION

### A.  Preliminary Injunction Standard

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To succeed on its motion for a preliminary injunction, Citizens United must "establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in

[its] favor, and that an injunction is in the public interest." *N.Y. Progress &
Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (quoting *Winter*, 555 U.S.
at 20).[1]

## B. Likelihood of Success on the Merits

### 1. First Amendment

Citizens United has not made the requisite "clear showing," *Winter*, 555
U.S. at 22, that it is likely to succeed on the merits of either of its First
Amendment claims on the record adduced to date in this litigation.

#### a. Unconstitutional Burden

##### i. Legal Standard

Charitable solicitation most certainly qualifies for First Amendment
protection. *See, e.g.*, *Vill. of Schaumburg v. Citizens for a Better Envt.*, 444 U.S.
620, 632–33 (1980). Because the Schedule B policy is a disclosure
requirement, it must satisfy exacting scrutiny. *See Ctr. for Competitive Politics
v. Harris*, 784 F.3d 1307, 1312 (9th Cir. 2015) (holding that exacting scrutiny
governed a First Amendment challenge to California's requirement that
registered charities file Schedule B with the state). Exacting scrutiny
requires the government to demonstrate "a substantial relation between the
disclosure requirement and a sufficiently important governmental interest."

---

[1] Although plaintiffs urge that they are eligible for a preliminary injunction if they
demonstrate "sufficiently serious questions going to the merits to make them a fair
ground for litigation and a balance of hardships tipping decidedly in the movant's
favor," *Random House, Inc. v. Rosetta Books LLC*, 283 F.3d 490, 491 (2d Cir. 2002) (per
curiam), that alternative standard does not apply where, as here, a plaintiff seeks to
enjoin "government action taken in the public interest pursuant to a statutory or
regulatory scheme," *Evergreen Ass'n Inc. v. City of N.Y.*, 740 F.3d 233, 245 (2d Cir. 2014);
*see also All. for Open Soc. Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 651 F.3d 218, 230 (2d Cir.
2011), *aff'd*, 133 S.Ct. 2321 (2013).

*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 366–67 (2010) (internal quotation marks and citation omitted); *see also John Doe No. 1 v. Reed*, 561 U.S. 186, 196 (2010); *Ctr. for Competitive Politics*, 784 F.3d at 1312. "Exacting scrutiny encompasses a balancing test." *Ctr. for Competitive Politics*, 784 F.3d at 1312. To survive, "the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Id.* (quoting *John Doe No. 1*, 561 U.S. at 196).[2]

### ii.   Scope of Challenge

Before analyzing the likelihood that plaintiffs' unconstitutional burden claim will succeed, the Court must define its scope, *i.e.*, whether the claim is "properly viewed as a facial or as-applied challenge." *John Doe No. 1*, 561 U.S. at 194. The complaint seeks a declaration that the Schedule B policy "is unconstitutional . . . as applied to charitable organizations that engage in solicitation, advocacy, and informational campaigns." (Compl. at 17.) This challenge certainly has a broad reach, given that such organizations undoubtedly comprise a large portion of the charities that the Attorney General supervises. In addition, by arguing that the Schedule B policy does not bear a substantial relation to any important governmental interest, plaintiffs suggest that the policy cannot lawfully be applied to *any* charity.

---

[2] Citizens United cites a line of cases that applied strict, rather than exacting, scrutiny to regulations governing the solicitation of charitable and campaign donations to support its argument that the Schedule B policy must be narrowly tailored to serve a compelling governmental interest. *See Williams-Yulee v. Fla. Bar*, 135 S.Ct. 1656, 1664–65 (2015); *Green Party of Conn. v. Garfield*, 616 F.3d 189, 208 (2d Cir. 2010); *c.f. Vill. of Schaumburg*, 444 U.S. at 636–37 (explaining that restrictions on charitable solicitation must be "narrowly drawn" to "serve[] a sufficiently strong, subordinating interest"). But unlike the regulations in those cases, the Schedule B policy functions as a disclosure requirement rather than a prohibition on speech: it "may burden the ability to speak," but it "do[es] not prevent anyone from speaking." *Citizens United*, 558 U.S. at 366 (internal quotation marks and citation omitted). Plaintiffs' strict scrutiny cases are inapposite.

(*See* Tr. of Oct. 10, 2014 Oral Arg. ("Arg. Tr."), at 12.) These factors indicate that plaintiffs' claim is best characterized as a facial attack. *See Ctr. for Competitive Politics*, 784 F.3d at 1314–15. However, plaintiffs also devote attention in the complaint and their motion papers to the particular harms that the Schedule B policy inflicts on them alone, which certainly squints in the direction of an as-applied challenge. *See Citizens United*, 558 U.S. at 370.

Ultimately, the Court does not find it necessary to place a firm label on plaintiffs' unconstitutional burden challenge because "[t]he label is not what matters." *John Doe No. 1*, 561 U.S. at 194. Plaintiffs claim that the Schedule B policy is unconstitutional with respect to charities "that engage in solicitation, advocacy, and informational campaigns." (Compl. ¶ 39). The relief they seek would therefore "reach beyond the particular circumstances of these plaintiffs." *John Doe No. 1*, 561 U.S. at 194. As the Ninth Circuit recently concluded in an extremely similar First Amendment challenge to a virtually identical California regulation requiring registered charities to file Schedule B with the state, "the Attorney General would be hard-pressed to continue to enforce an unconstitutional requirement against any other member of the [charities] registry" if a preliminary injunction issued. *Ctr. for Competitive Politics*, 784 F.3d at 1314. Accordingly, this Court concludes that Citizens United must demonstrate a likelihood that the Schedule B policy fails exacting scrutiny not only as applied to it, but also as applied to those charities that engage in solicitation, advocacy, and informational campaigns in general. *See John Doe No. 1*, 561 U.S. at 194, 200.

iii.   Analysis

On the record as developed to date, Citizens United has not made a clear showing that its unconstitutional burden claim is likely to succeed.

1.  The Schedule B policy bears a substantial relation to sufficiently important governmental interests.

Through factual evidence and counsel's representations, the Attorney General has demonstrated on this record that the Schedule B policy bears a substantial relation to sufficiently important governmental interests. As noted above, the Attorney General's duties include ensuring that charities that solicit funds from New York residents comply with the law. *See Viguerie Co. v. Paterson*, 94 A.D.2d 672, 673 (1st Dep't 1983). The enforcement of charitable solicitation laws and the oversight of charitable organizations for the protection of donors are, without a doubt, sufficiently important governmental interests. *See Riley v. Nat'l Fed. of the Blind of N.C., Inc.*, 487 U.S. 781, 792, 795 (1988); *Vill. of Schaumburg*, 444 U.S. at 636–37; *Ctr. for Competitive Politics*, 784 F.3d at 1317.

The Attorney General has explained that requiring registered charities to file Schedule B furthers the government's interests in overseeing charitable organizations and enforcing solicitation laws because information on charities' sources of funding enables him to identify organizations that may be operating fraudulently or without a proper charitable purpose. (Def.'s Mem. of Law in Opp'n to Mot. for Prelim. Inj. ("Def.'s Opp'n") at 9; Arg. Tr. 17–18.) For example, a charity's multi-year filings of Schedule B may disclose that a single donor has consistently served as its primary source of funding, causing the Attorney General to question whether the charity is in reality a tool to evade taxes or launder money. (Arg. Tr. 17–18.) At oral argument, counsel described a specific instance in which an examination of Schedule B enabled the Charities Bureau to determine that close relatives of a major donor were the recipients of jobs with, and expenditures by, a charity, leading the Bureau to investigate whether the entity was truly pursuing charitable purposes. (Arg. Tr. 20–21.)

On this record, the Court is satisfied that the Schedule B policy bears a substantial relation to the important governmental interests of enforcing charitable solicitation laws and protecting New York residents from illegitimate charities. Schedule B represents an important part of the Attorney General's investigative arsenal because he can compare major donor information against other documents that charities submit, allowing him to uncover possible violations and ultimately take action against unlawful charities. (Arg. Tr. 17–22); *cf. Buckley v. Valeo*, 424 U.S. 1, 67–68 (1976) (noting that "recordkeeping, reporting, and disclosure requirements are an essential means of gathering the data necessary to detect violations" of campaign finance laws). In fact, the justifications that the Attorney General has offered here are remarkably similar to those that the Ninth Circuit found dispositive when it upheld California's comparable Schedule B requirement. *See Ctr. for Competitive Politics*, 784 F.3d at 1311, 1317.

Citizens United takes issue with the Attorney General's rationales, contending that uncovering tax evasion and investigating whether a charity is abusing its tax-exempt status is the responsibility of the IRS, not the Attorney General's Charities Bureau. (*See* Arg. Tr. 34–35.) But of course, a "charity" organized for the purpose of committing tax violations is not pursuing charitable aims, and the Attorney General has a responsibility to protect New York residents from falling prey to its solicitations. *See Viguerie Co.*, 94 A.D.2d at 673.

Citizens United also argues that the Charities Bureau may obtain major donor information through less intrusive methods, particularly by requesting Schedule B from the IRS. The Internal Revenue Code indeed provides that upon written request by a state officer, the IRS may disclose an organization's Schedule B "for the purpose of . . . the administration of State laws regulating the solicitation or administration of the charitable funds or charitable assets of such organizations." 26 U.S.C. § 6104(c)(3);

*see also* 26 U.S.C. § 6103(b)(1).[3] But the Attorney General supervises more than 65,000 registered charities with limited resources (Goldman Decl. ¶ 4; Arg. Tr. 19), and requiring him to submit separate written requests to the IRS for such an enormous quantity of Schedules B would be unduly cumbersome and inefficient—both for the Attorney General and for the IRS. *See Ctr. for Competitive Politics*, 784 F.3d at 1317 (crediting the Attorney General's argument that "having immediate access to Form 990 Schedule B increases her investigative efficiency"). Nor could the Charities Bureau simply limit its IRS requests to charities that it is actively investigating. The Attorney General has explained that Schedule B *itself* can flag illegal activity; therefore, requiring him to first suspect a violation in order to request a charity's Schedule B from the IRS would impede his oversight of charities. *See id.* (rejecting the plaintiff's argument that the Attorney General should obtain Schedules B through subpoenas alone because "reviewing significant donor information can flag suspicious activity"). This Court is satisfied on this record that the Attorney General's Schedule B policy bears a substantial relation to the governmental interests that the Attorney General has articulated.

---

[3] Although the parties do not address this issue, it appears that the portion of the Internal Revenue Code on which Citizens United relies may not authorize the IRS to disclose the Schedules B of section 501(c)(3) organizations—such as plaintiff Citizens United Foundation—to state officials. *See* 26 U.S.C. § 6104(c)(3) (permitting the IRS to disclose "returns and return information of any organization described in section 501(c) *(other than organizations described in paragraph (1) or (3) thereof)*") (emphasis added); *Ctr. for Competitive Politics*, 784 F.3d at 1318. If in fact federal law does not permit the IRS to disclose section 501(c)(3) organizations' Schedules B, the Attorney General's need to obtain major donor information directly from such charities is even stronger.

> 2. The strength of the Attorney General's interests in the Schedule B policy justify its minimal burdens on charities' rights of speech and association.

In light of the important governmental interests that the Schedule B policy serves, the Court cannot find on this record that it places unjustified burdens on charities' rights of speech and association. Because plaintiffs claim that the Schedule B policy is unconstitutional with respect to charities that engage in solicitation, advocacy, and informational campaigns, the Court must consider whether the policy "reflect[s] the seriousness of the actual burden" on those charities, not just on plaintiffs alone. *See John Doe No. 1*, 561 U.S. at 190, 194, 196, 200.

Citizens United contends that the Schedule B policy inflicts three distinct but related harms: (1) invading the privacy of donors who wish to remain anonymous; (2) causing donors to fear "backlash and financial harm" should their support of controversial causes become publicly known; and (3) chilling donations to charities, leading to a concomitant reduction in charities' ability to speak.[4] (Compl. ¶¶ 40–41; Aff. of David N. Bossie dated May 19, 2014 ("Bossie Aff.") ¶¶ 6–9, 13.)

---

[4] At oral argument, plaintiffs took the position that a First Amendment violation would exist even in the absence of evidence that the Schedule B policy imposes actual burdens on charities' rights of speech and association. (*See* Arg. Tr. 29.) The Court does not accept that proposition. Counsel relied on *Talley v. California*, 362 U.S. 60, 63–65 (1960), in which the Supreme Court invalidated an ordinance banning the distribution of handbills that did not identify their sponsors. In that case, counsel argued, the Supreme Court did not require a showing that disclosure of the handbill sponsors' names would cause them harm. (Arg. Tr. 29.) As the Ninth Circuit explicated in *Center for Competitive Politics*, however, *Talley* does not stand for the proposition that disclosure *itself* constitutes an injury that relieves the Court of its duty to consider the Schedule B policy's actual burdens, if any, on speech and association. *See Ctr. for Competitive Politics*, 784 F.3d at 1316 & n.8. Rather, "[t]he basis for the [Supreme] Court's holding was the

Importantly, any burden that Citizens United has identified is premised largely on the threat of *public* disclosure of donors' identities. Yet there is no evidence that the Schedule B policy presents a cognizable risk of public disclosure of major donor information. The Charities Bureau has consistently followed a long-standing policy of keeping donor information confidential, and it does not disclose Schedule B under New York's Freedom of Information Law ("FOIL"). (Goldman Decl. ¶¶ 13–16.) The Instructions for Form CHAR500 expressly state that Schedule B is "exempt from FOIL disclosure to the public." (Ex. G to Goldman Decl. at 6.) Despite plaintiffs' assertions to the contrary, FOIL provides firm legal authority for the Attorney General's practice. It states that an "agency may deny access to records . . . that are specifically exempted from disclosure by state or federal statute." N.Y. Pub. Off. Law § 87(2)(a). Because the Internal Revenue Code mandates the confidentiality of Schedule B, *see generally* 26 U.S.C. § 6103, the Attorney General may also lawfully refuse to disclose it to the public—which is in fact his established and unwavering policy, as illustrated in the Instructions to Form CHAR500.[5] *See Ctr. for Competitive Politics*, 784 F.3d at 1316 n.9 (declining to credit the plaintiff's fears of public disclosure of Schedule B because such disclosure "is likely not authorized by California law"); (*see also* Goldman Decl. ¶¶ 14–16). In light of the lack of risk that the Attorney General will publicly release major donor information, plaintiffs'

---

historic, important role that anonymous pamphleteering has had in furthering democratic ideals. . . . Thus, in [*Talley*], the Court was certain of the First Amendment harm that the ordinance imposed." *See id.* at 1316 n.8; *see also Talley*, 362 U.S. at 64. Consequently, the Court must analyze the "*actual* burden" at stake here. *Ctr. for Competitive Politics*, 784 F.3d at 1314 (quoting *John Doe No. 1*, 561 U.S. at 196) (emphasis in original).

[5] Even assuming *arguendo* that FOIL does not authorize the Attorney General to withhold Schedule B from the public, there is no evidence in this record that any actual threat of public disclosure exists. Plaintiffs have neither cited to a past instance of publication by the Attorney General nor pointed to any FOIL request for a charity's Schedule B.

fears of public backlash and financial harm are speculative and fail to support their contention that the Schedule B policy chills donors' association with, and contributions to, charities. *See Ctr. for Competitive Politics*, 784 F.3d at 1316 & n.9.

Although plaintiffs have focused primarily on the threat of *public* disclosure of Schedule B, they also suggest that compelled disclosure of donor identities to the *Attorney General* itself raises First Amendment problems. Plaintiffs argue that because their agenda includes public criticism of the New York Attorney General and his policies (including the Schedule B policy at issue here), their donors wish to shield their identities from him. (Arg. Tr. 30–31.) It is true that "non-public disclosures can still chill protected activity where a plaintiff fears the reprisals of a government entity." *Ctr. for Competitive Politics*, 784 F.3d at 1316. But the scope of this First Amendment challenge extends beyond plaintiffs themselves, and there is absolutely no evidence in this record that other charities that promote their messages through solicitation, advocacy, and informational campaigns share plaintiffs' fears of retaliation by the Attorney General. *See John Doe No. 1*, 561 U.S. at 200–01.

In the end, the only burden that might apply to such charities *in general* is the Schedule B policy's frustration of their donors' generalized interest in giving anonymously. To the extent such an interest actually exists, there has been no evidence (or even argument) that the policy has caused donors to curtail their participation in, or contributions to, charities that engage in solicitation, advocacy, and informational campaigns. Whatever burden the Schedule B policy places on donors' "broad interest in anonymity" can therefore only be described as modest in light of the significant governmental interests that the policy serves. *See Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 482 (7th Cir. 2012).

In conclusion, the Court finds that on this record, the Schedule B policy bears a substantial relation to the important governmental interests of enforcement of charitable solicitation laws and the oversight of charitable

organizations for the protection of New York residents. The government's interests in enforcing the Schedule B policy clearly outweigh any burden that it may impose on charities that engage in solicitation, advocacy, and informational campaigns. Citizens United therefore has not demonstrated that it is likely to succeed on the merits of its claim that the Attorney General's interests in enforcing the Schedule B policy do not justify the burdens it places on charities' rights of speech and association.[6]

───────────────────

[6] Even if plaintiffs' unconstitutional burden claim were properly construed as a challenge to the Schedule B policy only as applied to Citizens United and Citizens United Foundation, the Court would find that the strength of the government's interests justify the burdens that the Schedule B policy places on their speech and association rights. David N. Bossie, president of both organizations, avers that based on plaintiffs' "experience from more than a quarter century of fundraising . . . if individuals know that their names could become public record, they will often refuse to donate." (Bossie Aff. ¶ 7.) He explains that "donors reasonably fear public backlash and financial harm should their support of politically contentious and controversial causes become publicly know[n]." (*Id*.) Bossie believes that plaintiffs lost the financial support of at least two major donors due to those donors' fears of being publicly exposed. (*Id*. ¶¶ 9, 11.) Because there is no evidence of a cognizable risk that the Attorney General will publicize the identity of plaintiffs' donors, the Court assigns very little weight to Bossie's concerns. *See Citizens United*, 558 U.S. at 370 (explaining that Citizens United could maintain an as-applied challenge if "there were a reasonable probability that the group's members would face threats, harassment, or reprisals if their names were disclosed").

Nor could plaintiffs prevail in an as-applied challenge based on disclosure of their major donor information solely to the Attorney General. Plaintiffs have not adequately explained *why* their donors fear the Attorney General will target them; nor have they provided a single example of past retaliation against their donors by any law enforcement official whatsoever. *Cf. Citizens United*, 558 U.S. at 370 ("Citizens United has been disclosing its donors for years and has identified no instance of harassment or retaliation."). On this record, plaintiffs' fears of persecution by the Attorney General do not rise above the level of speculation and do not defeat his strong interest in enforcing

### b.  *Prior Restraint*

Citizens United also brings a separate First Amendment prior restraint challenge to certain provisions of Article 7-A of the New York State Executive Law, the statute that gives the Attorney General authority to require charities to submit Schedule B. Article 7-A directs registered charities to "file with the attorney general an annual written financial report, on forms prescribed by the attorney general." N.Y. Exec. Law § 172-b(1). It also authorizes the Attorney General to "make rules and regulations necessary for the administration of this article." *Id.* § 177(1). Citizens United alleges that these statutory provisions amount to unconstitutional prior restraints on speech because they give the Attorney General "unbridled discretion . . . to require virtually any information that he so desires as a precondition to the exercise of First Amendment rights." (Pls.' Mem. 12.)

### i.  Legal Standard

A prior restraint on speech violates the First Amendment if it places "unbridled discretion in the hands of a government official or agency." *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 757 (1988). To pass constitutional muster, "'a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license' must contain 'narrow, objective, and definite standards to guide the licensing authority.'" *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 131 (1992) (quoting *Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 150–151 (1969)). Importantly, courts considering a prior restraint claim must analyze not only the text of the challenged law itself, but also any limits on the official's discretion that are "made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice." *Lakewood*, 486 U.S. at 770. This

---

the Schedule B policy. *See Ctr. for Competitive Politics*, 784 F.3d at 1316–17; *Ctr. for Individual Freedom*, 697 F.3d at 483.

rule applies "even if the face of the statute might not otherwise suggest the limits imposed." *Id.* at 770 n.11.

Prior restraint claims are properly analyzed as facial challenges. *See Children First Found., Inc. v. Fiala*, --F.3d--, 2015 WL 2444501, at *9 (2d Cir. May 22, 2015) (noting that "every prior application of the unbridled discretion doctrine . . . [has been] construed as a facial challenge"), *abrogated on other grounds by Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 135 S.Ct. 2239 (2015).

> ii.   Article 7-A is not an unconstitutional prior restraint on speech.

Because Article 7-A requires charities to register with the Attorney General and submit annual reports in order to solicit contributions in New York, it functions as a prior restraint on speech. *See Am. Target Advert., Inc. v. Giani*, 199 F.3d 1241, 1250 (10th Cir. 2000). Nonetheless, plaintiffs are not likely to succeed on the merits of their claim because the binding regulation that implements Article 7-A sets forth "narrow, objective, and definite standards" that cabin the Attorney General's exercise of discretion. *Forsyth Cnty.*, 505 U.S. at 131 (internal quotation marks and citation omitted).

Article 7-A confers discretion on the Attorney General by authorizing him to prescribe the content of charities' annual report forms. N.Y. Exec. Law § 172-b(1). The Court cannot analyze the statutory text in a vacuum, however, because the Attorney General's binding regulation, 13 NYCRR § 91.5(c), specifies the documents that "constitute a complete annual filing for a charitable organization." The required documents include the CHAR500 form and "IRS form 990, 990-EZ or 990-PF with schedules." *Id.* § 91.5(c)(3)(i)(a). Critically, the regulation's list of documents represents a closed set, and it does not provide authority for the Charities Bureau to require charities to submit additional information with their annual reports. *See* 13 NYCRR § 91.5(c). Moreover, as plaintiffs concede, section 91.5(c) applies to all registered charities. (Arg. Tr. 17.) Considered in conjunction

with its "binding . . . administrative construction," *Lakewood*, 486 U.S. at 770, Article 7-A does not confer unfettered discretion on the Attorney General to impose additional conditions on charities that wish to solicit donations in New York.

*Lakewood* and *American Target Advertising*, the cases on which plaintiffs rely, do not require a different result. Unlike section 91.5, the unconstitutional licensing schemes in both those cases featured catch-all provisions authorizing government officials to demand unspecified information or to impose supplementary conditions on a discretionary, ad hoc basis. *See Lakewood*, 486 U.S. at 769 (empowering the mayor to require "such other terms and conditions deemed necessary and reasonable"); *Am. Target Advert.*, 199 F.3d at 1251–52 (stating that applicants for a solicitation permit must supply "any additional information the division may require"). The courts in both cases held that those unrestricted grants of authority violated the First Amendment by failing to prescribe clear standards to guide the official's exercise of discretion. *Compare* 486 U.S. at 769, 772, *with* 199 F.3d at 1252. By contrast, 13 NYCRR § 91.5(c) suffers from no such deficiency.[7] Accordingly, Citizens United has not shown a likelihood of success on the merits of its prior restraint claim.

---

[7] Plaintiffs also rely heavily on *Public Citizen, Inc. v. Pinellas County*, 321 F. Supp. 2d 1275 (M.D. Fla. 2004), which considered a prior restraint challenge to a county ordinance requiring charities to obtain a permit before soliciting donations. The ordinance authorized a county official to "promulgate the forms deemed necessary to carry out his or her responsibilities," including permit application forms. *Id.* at 1292–93. *Public Citizen*, as a decision from a district court in the Eleventh Circuit, is not binding on this Court. The Court affords it no weight because that court failed to consider the standard permit application form issued by the county official (which did not include a catch-all provision), despite the Supreme Court's instructions that courts "must consider the county's authoritative constructions of the ordinance, including its own implementation and interpretation of it." *Forsyth Cnty.*, 505 U.S. at 131.

### 2. *Due Process*

Plaintiffs next contend that the Attorney General's enforcement of the Schedule B policy constitutes a Fourteenth Amendment due process violation. They allege that prior to 2013, the Charities Bureau had not indicated that it read section 91.5 to require the submission of Schedule B and that charities therefore "had no way of knowing" that disclosing their major donor information "was a prerequisite for political speech." (Pls.' Reply 9.) Plaintiffs are not likely to succeed on the merits of their due process claim because the evidence in this record shows that the Charities Bureau has in fact never changed its interpretation of section 91.5.

In 2003, the Attorney General promulgated a regulation identifying the documents that must accompany CHAR500. (Goldman Decl. ¶ 7.) The 2003 regulation directed charities to submit "IRS Form 990, 990EZ or 990PF, including schedules A and B." (*Id.*) In 2006, following a public notice-and-comment period, the Attorney General published a new regulation that replaced the 2003 version. (*Id.* ¶ 8); 28 N.Y. Reg. 45 (Mar. 29, 2006) (proposed rule); 28 N.Y. Reg. 19 (Oct. 4, 2006) (final rule). As described above, the 2006 regulation requires charities to provide "a copy of the complete IRS Form 990, 990-EZ or 990-PF with schedules." 13 NYCRR § 91.5(c)(3)(i)(a). The Charities Bureau revised the regulatory language in order to account for the IRS's anticipated changes to Form 990 and its schedules. (Goldman Decl. ¶¶ 9–11.)

Citizens United stakes its due process claim on *Federal Communications Commission v. Fox Television Stations, Inc.*, 132 S.Ct. 2307, 2317–18 (2012), which held that an agency may not take enforcement action unless it has given fair notice that the conduct at issue is unlawful. In 2004, the Federal Communications Commission ("FCC") changed its policy regarding broadcast indecency. *See id.* at 2314. It then brought enforcement actions against broadcasters that, prior to the 2004 policy change, had aired programs containing instances of expletives and nudity. *Id.* at 2314–15. Critically, those broadcasts would not have been prohibited by the FCC's

pre-2004 indecency policy. *See id.* at 2318. The Supreme Court concluded that the FCC's application of the policy it instituted in 2004 to pre-2004 conduct violated due process because the FCC had "failed to provide a person of ordinary intelligence fair notice of what is prohibited." *Id.* (internal quotation marks, alteration, and citation omitted).

Citizens United urges the Court to apply the principle of *Fox* to this case, contending that the Attorney General is attempting to enforce a policy that he adopted without fair notice. Under Citizens United's interpretation, the regulatory language "IRS Form 990, 990-EZ or 990-PF with schedules" unambiguously conveys that Schedule B need only be attached to Form 990-PF—*not* Forms 990 or 990-EZ. (*See* Pls.' Mem. 15.) Citizens United argues that the Schedule B policy therefore represents an entirely new construction of section 91.5. On this theory, because the Attorney General did not undertake notice-and-comment rulemaking or otherwise publicize his views before adopting this "new" interpretation, registered charities lacked fair notice as to what the law requires.

Citizens United's due process argument fails because there is no evidence whatsoever that the Schedule B policy represents a new interpretation of section 91.5. CHAR500 forms that were in effect from 2006 through 2013 expressly include Schedule B in the checklist of documents that filers must attach to Form 990. (Goldman Decl. ¶ 12; Exs. A–E to Decl. of Katherine B. Dirks dated Oct. 14, 2014.) In addition, the Instructions for Form CHAR500, which were revised in 2010 and remain in effect today, state that "[t]he only parts of the annual filing exempt from FOIL disclosure to the public are: Schedule B (Schedule of Contributors) to the IRS Form 990 or 990-EZ." (Ex. G to Goldman Decl. at 6.) These documents demonstrate that the Attorney General has consistently interpreted section 91.5 to require charities to file Schedule B to IRS Form 990 with their CHAR500 forms. Consequently, even assuming that the regulation were susceptible to different readings, Citizens United would have had fair notice of the Attorney General's interpretation by reading the CHAR500 and the

Instructions, which unambiguously and consistently mandate the submission of Schedule B.[8]

Finally, Citizens United argues that even if the Attorney General has always interpreted section 91.5 to require the submission of Schedule B, his relatively recent interest in enforcing the regulation violates due process. The Charities Bureau implicitly concedes that it did not undertake systematic efforts to enforce the Schedule B requirement until 2012. (*See* Goldman Decl. ¶ 18; Arg. Tr. 19.) But as the Court has already found on this record, Citizens United had fair notice that section 91.5 required it to file Schedule B with its CHAR500 forms; that the Attorney General had not previously warned Citizens United of its noncompliance does not vitiate that notice. Nor has Citizens United alleged that the Charities Bureau has applied the Schedule B policy in a selective or discriminatory manner or that its decision to escalate enforcement resulted from an unconstitutional motive. Absent such forbidden factors, the government's renewed interest in enforcing an old regulation does not violate the Fourteenth Amendment. *See LaTrieste Rest. & Cabaret v. Vill. of Port Chester*, 40 F.3d 587, 590 (2d Cir.

---

[8] Nor has Citizens United shown a likelihood that the Attorney General's interpretation of section 91.5 is unreasonable under principles of state administrative law. Although Citizens United places great weight on the canon of construction known as the rule of the last antecedent, that "rule" is far from unbending. *See Long v. Adirondack Park Agency*, 76 N.Y.2d 416, 420 (1990) (rejecting a construction based on the rule of the last antecedent because it ran contrary to the purpose, intent, and overall structure of the statute); *Whitebox Convertible Arbitrage Partners, L.P. v. Fairfax Fin. Holdings, Ltd.*, 73 A.D.3d 448, 452 (1st Dep't 2010). At most, the text of section 91.5 is subject to two reasonable interpretations, and Citizens United has not demonstrated a likelihood that the Attorney General's construction is impermissible. *See Elcor Health Servs., Inc. v. Novello*, 100 N.Y.2d 273, 280 (2003) ("That the Department's interpretation might not be the most natural reading of the regulation, or that the regulation could be interpreted in another way, does not make the interpretation irrational."); *Entergy Nuclear Indian Point 2, LLC v. N.Y. State Dep't of State*, --N.Y.S.3d--, 2015 WL 4112421, at *1 (3d Dep't July 9, 2015).

1994) (addressing equal protection claim). For all of these reasons, Citizens United has not shown a likelihood of success on the merits of its due process claim.

### 3. *State Administrative Procedure Act*

Plaintiffs next contend that the Schedule B policy violates the State Administrative Procedure Act. Building off their due process argument, plaintiffs maintain that the policy constitutes an amendment to section 91.5 and therefore should have been enacted in accordance with SAPA's formal rulemaking procedures.

As the Court has already found based on the record of this motion, the Attorney General has consistently interpreted section 91.5 to require the submission of Schedule B. In other words, the Schedule B policy is neither a new rule nor an amendment to a prior rule, but rather a long-held interpretation of an existing rule. New York courts have held that SAPA's notice-and-comment rulemaking requirements do not apply to agencies' interpretations of their regulations. *See Elcor Health Servs.*, 100 N.Y.2d at 279; *Bloomfield v. Cannavo*, 123 A.D.3d 603, 606 (1st Dep't 2014). Plaintiffs therefore have not demonstrated a likelihood of success on the merits of their SAPA claim.

### 4. *Preemption*

Finally, plaintiffs contend that federal law preempts the Schedule B policy. In particular, they assert that the policy frustrates the purposes and objectives that Congress had in mind when it ensured the confidentiality of Schedule B and established a specific process by which state officials may request it from the IRS. Section 6104(c) of the Internal Revenue Code provides:

> Upon written request by an appropriate State officer, the Secretary may make available for inspection or disclosure returns and return information of any organization described in section 501(c) (other

than organizations described in paragraph (1) or (3) thereof) for the purpose of, and only to the extent necessary in, the administration of State laws regulating the solicitation or administration of the charitable funds or charitable assets of such organizations.

26 U.S.C. § 6104(c). In addition, the Internal Revenue Code provides for civil and criminal penalties in the event of the unauthorized disclosure of an organization's Schedule B. *See* 26 U.S.C. §§ 6103(a), 7213(a). Citizens United argues that the Attorney General is utilizing the Schedule B policy to circumvent the federal statutory process by which state officials may obtain charities' major donor information.

Under the doctrine of conflict preemption, a state law is preempted when it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 132 S.Ct. 2492, 2501 (2012) (internal quotation marks and citation omitted). However, "[i]n preemption analysis, courts should assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'" *Id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). Because the oversight of charitable organizations for the protection of the public falls within the traditional police powers of the state, *see Viguerie Co.*, 94 A.D.2d at 673, the Court must apply a "strong presumption against preemption." *Steel Inst. of N.Y. v. City of N.Y.*, 716 F.3d 31, 36 (2d Cir. 2013).

Citizens United has not demonstrated on this record a likelihood that Congress intended to preclude states from obtaining Schedules B directly from charitable organizations. In *Center for Competitive Politics*, the Ninth Circuit rejected essentially the same argument that Citizens United makes here. *See* 784 F.3d at 1318–19. That court held that section 6104 of the Internal Revenue Code "may support an argument that Congress sought to regulate the disclosures that the IRS may make, but [it does] not broadly prohibit other government entities from seeking that information directly from the organization." *Id.* at 1319. The court concluded that it could not infer "that

Congress intended to bar state attorneys general from requesting the information contained in Form 990 Schedule B" directly from charities they are responsible for supervising. *Id.*

Citizens United relies on the same Internal Revenue Code provisions that were at issue in *Center for Competitive Politics*, and this Court agrees with the Ninth Circuit that there is no evidence that Congress intended to prohibit states from obtaining Schedules B directly from charitable organizations. Consequently, Citizens United has not demonstrated that it is likely to succeed on the merits of its preemption claim.

### C.   Irreparable Harm

In order to secure a preliminary injunction, plaintiffs must show that they are "likely to suffer irreparable harm in the absence of preliminary relief." *N.Y. Progress & Prot. PAC*, 733 F.3d at 486 (quoting *Winter*, 555 U.S. at 20). Because plaintiffs have not shown a likelihood that the Schedule B policy injures their First Amendment rights, conflicts with federal law, or violates due process or SAPA, they are not likely to suffer irreparable harm if the Court declines to preliminarily enjoin the Attorney General from enforcing the policy. *See Ctr. for Competitive Politics*, 784 F.3d at 1319–20.

Even if plaintiffs had demonstrated a likelihood of success on the merits of their claims, the Court would still find that they are not likely to suffer irreparable harm in the absence of preliminary relief. Plaintiffs contend that they are entitled to a presumption of irreparable harm because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). This presumption, however, only applies when the challenged restriction "directly limits speech." *Bronx Household of Faith v. Bd. of Educ. of the City of N.Y.*, 331 F.3d 342, 349 (2d Cir. 2003). The Schedule B policy functions as a disclosure requirement, not a direct limitation on speech. *See Citizens United*, 558 U.S. at 366; *N.Y. Progress & Prot. PAC*, 733 F.3d at 486–87. Where, as here, "a plaintiff alleges injury from a rule or regulation that

may only potentially affect speech," it must "articulate a 'specific present objective harm or a threat of specific future harm.'" *Bronx Household of Faith*, 733 F.3d at 350 (quoting *Laird v. Tatum*, 408 U.S. 1, 14 (1972)); *see also Charette v. Town of Oyster Bay*, 159 F.3d 749, 755 (2d Cir. 1998).

Plaintiffs have not shown that the Schedule B policy poses a "specific present objective harm or a threat of specific future harm." *Bronx Household of Faith*, 733 F.3d at 350 (internal quotation marks and citation omitted). Plaintiffs allege two types of injury: first, that the policy curtails their ability to speak because it deters potential donors from making financial contributions; and second, that the Attorney General may suspend or cancel plaintiffs' charitable registrations if they refuse to submit Schedule B. (*See* Pls.' Mem. 20–21.) As discussed with respect to plaintiffs' likelihood of success on the merits of their First Amendment claim, plaintiffs' allegations of the Schedule B policy's chill on donations are highly speculative and entitled to very little weight. *See supra* n.6.

Although the Attorney General's power to suspend plaintiffs' charitable registrations could in theory create a threat of specific future harm, Citizens United has not shown that this outcome is anything more than hypothetical. The Executive Law states that "[t]he attorney general shall cancel the registration of any organization which fails to comply" with the statute's annual reporting requirements. N.Y. Exec. Law § 172-b(5). Cancellation of an organization's registration requires notice and the opportunity for a hearing. *See id.* §§ 172-b(5), 177(3). The record here reflects that the Charities Bureau has never canceled a charity's registration for its failure to file Schedule B. (Arg. Tr. 15.) When the Court asked defense counsel at oral argument whether the Attorney General planned to cancel or suspend plaintiffs' registrations, she stated that "we obviously have the full array of enforcement options available to us, but no specific determination has been made." (*Id.* 14–15.) Because the Court cannot find a specific future threat that the Attorney General will prohibit plaintiffs from soliciting in New York as a result of their refusal to disclose their major

donor information, plaintiffs' attempt to "articulate a specific present objective harm or a threat of specific future harm," *Bronx Household of Faith*, 733 F.3d at 350 (internal quotation marks omitted), falls decidedly short.[9]

### D.  Balance of Equities and Public Interest

Finally, Citizens United has not demonstrated that the balance of equities tips in its favor or that a preliminary injunction serves the public interest. On this record, the only actual, non-speculative burden that the Schedule B policy imposes on plaintiffs' speech and association rights stems from its interference with their donors' subjective desire to remain completely anonymous. As the Court has already found, that burden is negligible. On the other end of the scale, prohibiting the Attorney General from obtaining Schedules B from organizations such as plaintiffs would materially impede his oversight of charities by precluding his access to information that exposes potential violations of the law. Moreover, the public has a strong interest in the enforcement of laws that protect it from unscrupulous charities, at least when such enforcement is not likely to lead to a First Amendment violation. *See Ctr. for Competitive Politics v. Harris*, No. 2:14-cv-00636, 2014 WL 2002244, at *7 (E.D. Cal. May 14, 2014). The Court concludes that the balance of equities weighs

---

[9] The Attorney General urges the Court to consider plaintiffs' delay in pursuing this action as part of its irreparable harm analysis. (Def.'s Opp'n 23–24.) Although the Attorney General sent plaintiffs a deficiency notice in April 2013 instructing them to submit their Schedules B (Goldman Decl. ¶ 21), plaintiffs did not file the complaint in this case until more than a year later, on May 22, 2014. Plaintiffs moved for a preliminary injunction almost one month after that, but did not serve the Attorney General with the summons and complaint until the Court ordered them to do so on July 2. (Dkt. Nos. 7, 9–10.) At oral argument, plaintiffs' counsel offered nary a justification for plaintiffs' sluggishness in challenging a law they claim is causing irreparable harm. (*See* Arg. Tr. 47–49.) Nonetheless, the Court does not factor plaintiffs' delay into its irreparable harm analysis.

heavily in favor of the Attorney General and that the public interest is served by his continued enforcement of the Schedule B policy.

### III.  CONCLUSION

Based on the evidence that the parties have presented to the Court at this stage in the litigation, the Court holds that plaintiffs are not entitled to a preliminary injunction prohibiting the Attorney General from obtaining their Schedules B.

Most importantly, plaintiffs have not demonstrated a likelihood of success on the merits of any of their claims. Plaintiffs' First Amendment unconstitutional burden claim is not likely to succeed because, on this record, the Attorney General has shown that the Schedule B policy substantially relates to the important governmental interests of enforcing charitable solicitation laws and overseeing charitable organizations for the protection of the public. These interests justify the minimal burdens that the Schedule B policy places on charities' speech and association rights. Moreover, because the Attorney General does not possess unbridled discretion to impose conditions on the ability of charities to speak, plaintiffs are not likely to succeed on their First Amendment prior restraint claim.

Nor are plaintiffs likely to prevail on the remainder of their claims. Their due process and SAPA claims lack merit because the evidence in the record shows that plaintiffs had prior notice of the Attorney General's interpretation of section 91.5, which was promulgated in accordance with SAPA's notice-and-comment procedures. And because there is insufficient evidence that Congress intended to prevent state attorneys general from obtaining Schedule B directly from charities, plaintiffs are not likely to win their preemption challenge.

Finally, plaintiffs have not shown that they will suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in their favor, or that a preliminary injunction serves the public interest. Because Citizens United and Citizens United Foundation have not made a "clear

showing" that they are entitled to the "extraordinary remedy" of a preliminary injunction, *Winter*, 555 U.S. at 22, their motion is denied.


Dated:  New York, New York
        July 27, 2015

                            SO ORDERED:

                            _____
                            Sidney H. Stein, U.S.D.J.