USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/29/16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
CITIZENS UNITED and CITIZENS :
UNITED FOUNDATION, :
 :
                            Plaintiffs, : 14-Cv-3703 (SHS)
        -against- :
 : OPINION & ORDER
ERIC SCHNEIDERMAN, in his official :
capacity as New York Attorney General, :
 :
                           Defendant. :
-----------------------------------------------------------x

SIDNEY H. STEIN, U.S. District Judge.

Plaintiffs Citizens United and Citizens United Foundation challenge the New York Attorney General's policy of requiring charities to disclose to him the names, addresses, and total contributions of their donors in order to be permitted to solicit funds in the state. Last year, this Court denied plaintiffs' motion for a preliminary injunction on the grounds that plaintiffs were not likely to succeed on the merits of their claims. Plaintiffs subsequently amended their complaint and Attorney General Eric Schneiderman has now moved to dismiss it. For the reasons that follow, the attorney general's motion is granted.

I. BACKGROUND

Citizens United is a nonprofit corporation which has federal tax-exempt status as a "social welfare" organization, *see* 26 U.S.C. § 501(c)(4). (First Am. Compl. ("FAC") ¶ 3.) Citizens United Foundation has federal tax-exempt status pursuant to 26 U.S.C. § 501(c)(3). (FAC ¶ 4.) Both plaintiffs pursue similar goals: they "seek[] to promote the traditional American values of limited government, free enterprise, strong families, and national sovereignty and security." (FAC ¶ 3; *see also* FAC ¶ 4.) The social welfare entity—Citizens United—advocates these positions by producing "high-impact documentaries on political themes." (FAC ¶ 11.) By contrast, Citizens United Foundation, as a section 501(c)(3) organization, cannot

advocate but instead simply "inform[s]" and "educate[s]" the American public about essentially identical issues and themes. (FAC ¶¶ 4, 12.) Plaintiffs' ability to produce their advocacy documentaries (Citizens United) and their educational materials (Citizens United Foundation)—and to operate their organizations generally—is "entirely dependent on the donations they are able to raise" from their supporters. (FAC ¶ 15.)

Plaintiffs are well-known entities. Indeed, they allege that they "have gained a special measure of notoriety in recent years" and have even "been compared to al-Qaeda, described as an 'enemy of the people,' and worse." (FAC ¶ 35.) The amended complaint also alleges that plaintiffs' donors "value their privacy and donate to plaintiffs with the understanding that their names and other identifying information will not become public information." (FAC ¶ 15.) According to plaintiffs, their donors "reasonably fear public backlash, financial harm, and worse, should their support of politically contentious and controversial causes become known publicly." (FAC ¶ 17.)

This brings us to the subject of this action: New York requires every "charitable organization"—whose definition includes both plaintiffs, defendant says, (see FAC ¶ 26)—to "file with the attorney general a prescribed registration form" in order for that charity to be able to solicit funds in New York. N.Y. Exec. Law § 172(1). The attorney general has promulgated regulations to set the requirements of that form. See 13 N.Y.C.R.R. § 91.5. One regulation requires charitable organizations to submit for the attorney general's review a copy of a form that plaintiffs file annually with the Internal Revenue Service—Form 990 and its Schedule B—which lists each of plaintiffs' donors and amounts contributed. (FAC ¶¶ 20, 23, 26); 13 N.Y.C.R.R. § 91.5(c)(3)(i)(a). Charities must submit this Schedule B—and thus reveal their donors' identities and amounts contributed—prior to soliciting funds in New York. (FAC ¶¶ 23, 26.)

Both plaintiffs (together, "Citizens United") have submitted to the attorney general their Schedule B forms "every year since 1995." (FAC ¶ 25.) Traditionally, however, they "filed only the first page of their Schedule B, which does not include any donor information." (FAC ¶ 30.) In 2012, they filed the first pages of their Schedules B as usual but received deficiency notices in response stating that they would need to file Schedules B that

were unredacted. (FAC ¶ 26.) Plaintiffs have refused to comply. (FAC ¶ 29.) Consequently, they "face the loss of their registration, which would prohibit them from soliciting funds, as well as civil penalties of up to $100 per day for noncompliance." (FAC ¶ 31 (citing N.Y. Exec. Law § 177(2).)

After plaintiffs initiated this action they moved for a preliminary injunction, which this Court denied, *Citizens United v. Schneiderman*, 115 F. Supp. 3d 457 (S.D.N.Y. 2015). Plaintiffs subsequently amended their complaint, and, as noted above, defendant has now moved to dismiss it in its entirety. Fed. R. Civ. P. 12(b)(6).

## II. DISCUSSION

### A. Legal Standard

The standard of review governing this motion is well-established: the Court must dismiss the complaint if it fails to allege facts that show plaintiffs' claims are "plausible." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Neopharm Ltd. v. Wyeth-Ayerst Int'l LLC*, __ F. Supp. 3d __, 2016 WL 1076931, at *2 (S.D.N.Y. Mar. 18, 2016). Plaintiffs, however, cite to the retired standard set forth in *Conley v. Gibson*, 355 U.S. 41 (1957), which merely required a plaintiff's complaint to give a defendant "fair notice of what the plaintiff's claim is." *Id.* at 47. *Conley* no longer states the applicable law: The modern "plausibility" standard has governed motions to dismiss pleadings in federal court since 2007. *E.g., Iqbal*, 556 U.S. at 670; *Twombly*, 550 U.S. at 570; *E.E.O.C. v. Port Auth. Of N.Y. & N.J.*, 768 F.3d 247, 253 (2d Cir. 2014).

Not all allegations are created equal in assessing the plausibility of a claim. Allegations that are conclusory or that simply parrot legal standards need not be credited. *See, e.g., Iqbal*, 556 U.S. at 678; *Port Auth.*, 768 F.3d at 253; *Fisher v. JP Morgan Chase & Co.*, 703 F. Supp. 2d 374, 390 (S.D.N.Y. 2010). And facts that are pleaded merely "upon information and belief" can only be credited when those facts are "peculiarly within the possession and control of the defendant," or where plaintiffs' "information" or "belief" is "based on factual information that makes" the sought inference "plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010); *Moffett v. Town of Poughkeepsie*, No. 11-cv-6243, 2012 WL 3740724, at *3, *5, *8 (S.D.N.Y. Aug. 29, 2012). Facts alleged properly, however, must be credited as true and

3

viewed in the "light most favorable to the plaintiff." *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 118 (2d Cir. 2013).

### B. First Amendment.

Citizens United has brought three First Amendment claims; Attorney General Schneiderman argues that none is plausible. The Court examines each in turn.

#### 1. Prior Restraint.

Plaintiffs contend first that New York's charitable registration scheme is an unconstitutional prior restraint on speech. At the outset, it is clear that the regime is plausibly a prior restraint. *See Citizens United*, 115 F. Supp. 3d at 469. Charitable organizations in New York are allegedly forbidden from engaging in expressive action—soliciting donations, *see, e.g., Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980)—unless and until they file forms required by the attorney general's implementing regulations. *See* N.Y. Exec. Law § 172; 13 N.Y.C.R.R. § 91.5(c). This includes the attorney general's requirement that charities file unredacted versions of their Schedules B that disclose to the attorney general the names and contributions of Citizens United's donors. (FAC ¶ 26.)

Prior restraints are generally disfavored but are not "'unconstitutional per se.'" *Hobbs v. Cty. of Westchester*, 397 F.3d 133, 148 (2d Cir. 2005) (quoting *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558 (1975)). In particular, the First Amendment does not countenance a system of prior restraint when it vests "unbridled discretion in a government official over whether to permit or deny expressive activity." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755 (1988); *Field Day, LLC v. Cty. of Suffolk*, 463 F.3d 167, 176 (2d Cir. 2006). However, if a system of prior restraint contains "'narrow, objective, and definite standards to guide the licensing authority'" it survives a First Amendment challenge. *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 131 (1992) (quoting *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150-51 (1969)).

The analysis begins with the governing statutory and regulatory text. *See City of Lakewood*, 486 U.S. at 769-70. The statute—the New York Executive Law—requires all charities to "file with the attorney general an annual written financial report, on forms prescribed by the attorney general." N.Y.

4

Exec. Law § 172-b(1); *accord* N.Y. Exec. Law § 172(1). That broad delegation to defendant was cabined when he formally promulgated regulations that limit the documents that charities need to file upon registering, including, *inter alia*, "a copy of the complete IRS form 990. . . with schedules." 13 N.Y.C.R.R. § 91.5(c)(3)(i)(*a*). Those regulations set forth a "closed set" of required documents which substantially fetter the attorney general's discretion. *Citizens United*, 115 F. Supp. 3d at 469. *See also Forsyth Cty*, 505 U.S. at 131; *City of Lakewood*, 486 U.S. at 770. If a charity files the documents the regulations require, the attorney general must grant that charity a license to solicit donations in New York. If not, not. This the First Amendment allows. *See Children's First Found. v. Fiala*, 790 F.3d 328, 347-48, *withdrawn in part by* 611 F. App'x 741 (2d Cir. 2015).

The Amended Complaint alleges, however, that in practice the attorney general exercises far more discretion over this licensing regime than the First Amendment can tolerate. Specifically, according to plaintiffs, for nearly two decades charities were allowed to file redacted versions of Schedule B. (FAC ¶ 25-27.) But in 2012, plaintiffs allege, defendant unilaterally changed this practice. (FAC ¶¶ 26-27.) Plaintiffs contend that the attorney general—even if he ultimately lacks discretion to grant or deny charities the right to solicit in New York—has too much power to change the overall registration requirements.

Not all types of discretion render a license regime such as New York's unconstitutional. *See Children's First Found.*, 790 F.3d at 347. Indeed, the prohibition of such discretion is a "prophylactic" means of reducing the risk of two First Amendment injuries. *See id.* at 342 (citation omitted). First, prohibited discretion raises the specter of self-censorship insofar as individuals who seek to engage in expressive activity may be deterred from seeking a required speaking license if the requirements to gain that license are insufficiently clear. *City of Lakewood*, 486 U.S. at 757-58; *Children's First Found.*, 790 F.3d at 342-43. Second, discretion risks discrimination "against disfavored speech." *City of Lakewood*, 486 U.S. at 758. If officials can hide behind broad, discretionary standards to deny licenses to speak, they can surreptitiously silence the disfavored. *Children's First Found.*, 790 F.3d at 347.

The attorney general's power to change which documents must be filed to solicit in New York does not render intolerable any risk of self-censorship. All licensing systems are changeable in theory, whether by legislative edict,

executive fiat, or judicial decree. But the First Amendment does not and cannot prohibit all such regimes. *Cf. Children's First Found.*, 790 F.3d at 347; *Field Day*, 463 F.3d at 181. The U.S. Constitution clearly tolerates a slight risk that a speaker might be deterred from speaking because the government is free to alter licensing requirements. This is especially true where changes are infrequent. Here, for instance, the complaint only alleges one such change—filing unredacted versus redacted Schedules B—and thus there is no indication that the requirements of New York's charitable solicitation regime are so slippery that the regime at large discourages a theoretical speaker from even trying to use her voice.

Moreover, the discretion to change the charitable solicitation licensing requirements does not engender a constitutionally intolerable risk of discrimination. *See Children's First Found.*, 790 F.3d at 347. When charities seek to register in New York, they need to file certain documents. If the charity fails to file those documents, the attorney general is empowered to deny the charity permission to solicit donations in New York. Any such denial would be based on a "'narrow, objective, and definite'" reason. *Forsyth Cty.*, 505 U.S. at 131 (quoting *Shuttlesworth*, 394 U.S. at 150-51). The regime provides no cover for government officials to discriminate against disfavored charities, so long as the regime is "uniformly applied," *City of Lakewood*, 486 U.S. at 770 n.11, and any policy changes are justifiable in their own right. *See* Part II.B.2-3, *infra*.

Plaintiffs do, of course, contend that the policy has not been "uniformly applied," but the allegations supporting that argument are ineffectual. The relevant allegation is made "[o]n information and belief." (FAC ¶ 28.) The Amended Complaint fails to set forth what facts plaintiffs' information and belief are based upon and similarly fails to even attempt to explain why any such facts are "peculiarly within the possession and control of the defendant." *Arista Records*, 604 F.3d at 120. The Court therefore cannot—and does not—consider this allegation. *Id.* As a result, Citizens United has not plausibly pleaded that the attorney general's Schedule B policy is not "uniformly applied."

Plaintiffs' last argument to sustain their prior restraint claim is from a bygone era. They contend that whether the policy is "well-established" and "uniformly enforced"—i.e., whether it is excessively discretionary—requires the development of a factual record through discovery. But merely

6

attempting to plead the existence of a prior restraint is not a sufficient basis upon which to grant discovery.

Plaintiffs have failed to state a plausible claim that the alleged prior restraint is applied in an unconstitutionally discretionary manner. The prior restraint claim is therefore dismissed without prejudice.

### 2. *Facial Challenge.*

Defendant next moves to dismiss plaintiffs' claim that the Schedule B disclosure requirement facially violates the First Amendment, (*see* FAC ¶ 54.) Such facial challenges are "disfavored," *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008), and can only survive if the complaint plausibly alleges that "'no set of circumstances exists under which the [policy] would be valid,'" *id.* at 449 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Plaintiffs' facial challenge is only viable if the First Amendment prohibits the attorney general from requiring *any* charity—from the most popular and least controversial one to the least popular and most controversial one—to disclose to New York State its funding sources. *See id.* However, a facial challenge "*must* fail where the [policy] has a 'plainly legitimate sweep.'" *Id.* (quoting *Washington v. Glucksberg*, 521 U.S. 702, 739-40 & n.7 (1997) (Stevens, J., concurring in the judgment) (emphasis added).

It is well established that the Schedule B policy must satisfy "exacting scrutiny," "[b]ecause the Schedule B policy is a disclosure requirement." *Citizens United*, 115 F. Supp. 3d at 463. *See, e.g., Doe v. Reed*, 561 U.S. 186, 196 (2010); *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 366 (2010); *Ctr. for Competitive Politics v. Harris*, 784 F.3d 1307, 1312 (9th Cir. 2015); *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 477 (7th Cir. 2012); *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 55 (1st Cir. 2011). The standard of exacting scrutiny "requires a 'substantial relation' between the disclosure requirement and a 'sufficiently important governmental interest." *Doe*, 561 U.S. at 196 (citations omitted). To withstand exacting scrutiny, "'the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights.'" *Id.* (citation omitted). Disclosure laws such as the one at issue here have long been considered "a less restrictive alternative to more comprehensive regulations of speech," *Citizens United*, 558 U.S. at 369, and their facial validity has long seemed sure. *See Riley v.*

*Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 795 (1988); *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 962 n.9, 967 n.16 (1984).

The attorney general contends that the Schedule B policy supports the state's interests in "investigat[ing] potential violations of the charitable solicitation laws, and . . . protect[ing] New York residents from fraudulent solicitations." (Mem. of Law in Supp. of Def.'s Mot. To Dismiss the First Am. Compl. At 9, Dkt. No. 61 (citing *Viguerie Co. v. Paterson*, 94 A.D. 2d 672, 673 (1st Dep't 1983)).) These interests are unquestionably important. *See, e.g., Watchtower Bible & Tract Soc'y of N.Y. v. Vill. Of Stratton*, 536 U.S. 150, 164 (2002) (calling "the prevention of fraud" an "important interest[]."); *Riley*, 487 U.S. at 792 ("[T]he interest in protecting charities (and the public) from fraud is, of course, a sufficiently substantial interest to justify a narrowly tailored regulation."). States have strong interests in ensuring that charities do not serve as fronts for fraud or crime. *See Doe*, 561 U.S. at 217 (Stevens, J., concurring in the judgment).

The complaint fails to set forth that requiring charities to disclose their source of funds through filing unredacted Schedules B plausibly lacks a substantial relation to these important governmental interests. Indeed, the U.S. Supreme Court has noted that a state "may constitutionally require fundraisers to disclose certain financial information to the State" in order to help detect fraud. *Riley*, 487 U.S. at 795; *see also Joseph H. Munson Co.*, 467 U.S. at 967 n.16. The Court has also described "recordkeeping, reporting, and disclosure requirements" as "an *essential* means of gathering the data necessary to detect violations" of relevant laws. *Buckley v. Valeo*, 424 U.S. 1, 67-68 (1976) (per curiam) (emphasis added). No facts alleged in the complaint plausibly suggest that the attorney general's disclosure requirement is unusually divorced from the state's important governmental interests. His is a generic disclosure policy, one the First Amendment has long considered acceptable. *See Riley*, 487 U.S. at 795; *Joseph H. Munson Co.*, 467 U.S. at 967 n.16. As such, "[m]andatory registration and disclosure . . . directly promote [New York's] substantial interest in fighting fraud." *Am. Target Advert., Inc. v. Giani*, 199 F.3d 1241, 1248 (10th Cir. 2000).

The strength of New York's substantial governmental interests must also "'reflect the seriousness of the actual burden on First Amendment rights.'" *Doe*, 561 U.S. at 196 (citation omitted); *Citizens United*, 115 F. Supp. 3d at 463. Plaintiffs identify several alleged First Amendment injuries that

filing unredacted Schedules B will cause, including loss of the freedom of association, (FAC ¶ 51), and the "chill[ing]" of plaintiffs' speech due to lost donations, (FAC ¶¶ 29, 51). *See generally Ctr. for Competitive Politics*, 784 F.3d at 1312 (noting that "no case has ever held or implied that a disclosure requirement in and of itself constitutes a First Amendment injury").

While disclosing the identity of a charity's donors may burden these rights, *see Madigan*, 697 F.3d at 482, the allegations in the complaint do not plausibly establish that the rights are substantially burdened as to all charities seeking to solicit in New York State, as they must be to present a viable facial challenge. *Doe*, 561 U.S. at 191. Indeed, the complaint's main thrust is that the attorney general's disclosure requirements will excessively burden *plaintiffs*, but they plead no facts to suggest that their alleged experience is common to charities across this state. *See id.* at 200-01. Absent facts pleaded to present a plausible case that the attorney general's policy is inappropriately burdensome "in all of its applications," no facial challenge can proceed. *Wash. State Grange*, 552 U.S. at 449.

The Supreme Court's decision in *Doe v. Reed*, 561 U.S. 186 (2010), makes this plain. There, the plaintiffs mounted a facial challenge to a Washington State law requiring disclosure of the names of individuals who signed referendum petitions. *Id.* at 191. The plaintiffs asserted that the disclosure violated the First Amendment and the Court applied exacting scrutiny. *Id.* at 196. The Court rejected the plaintiffs' facial challenge, writing that:

> The problem for plaintiffs is that their argument rests almost entirely on the specific harm they say would attend disclosure of the information on the [the specific petition plaintiffs had signed], or on similarly controversial ones. But typical referendum petitions "concern tax policy, revenue, budget, or other state law issues." Voters care about such issues, some quite deeply—but there is no reason to assume that any burdens imposed by disclosure of typical referendum petitions would be remotely like the burdens plaintiffs fear in this case.

*Id.* at 200-01 (citations omitted). Although *Doe's* posture is different from this action's—there the Court reviewed the denial of a preliminary injunction—the legal conclusion is applicable here. The plaintiffs in *Doe* offered "scant evidence or argument beyond the burdens they assert disclosure would impose" on them or "the signers of other similarly

controversial petitions." *Id.* at 201. To adapt the same language: plaintiffs in this action have provided "scant [allegations] or argument beyond the burdens they assert disclosure would impose" on *them* or similarly "controversial" charities seeking to solicit in New York.

Citizens United's arguments to the contrary are unavailing. They assert that they are entitled to discovery to "test" the various interests undergirding the attorney general's policy, the policy's relationship with those interests, and the balance between the interests and individual rights burdened. But plaintiffs do not cite—nor has the Court found—any case authority supporting the proposition that merely pleading the existence of a disclosure requirement such as the attorney general's entitles the plaintiff and subjects the state to discovery, especially where the policy has a "plainly legitimate sweep." *See Wash State Grange*, 552 U.S. at 449 (citations and internal quotation marks omitted).

This Court concludes that the complaint fails to plead that the attorney general's policy of requiring charities to file unredacted versions of Schedule B before soliciting funds in New York is facially unconstitutional. There is "a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Doe*, 561 U.S. at 196 (quoting *Citizens United*, 558 U.S. at 366-67 (quoting *Buckley*, 424 U.S. at 64)) (internal quotation marks omitted). The strength of the state's interest reflects the "seriousness of the actual burden on First Amendment rights," especially because plaintiffs have failed to allege that the disclosure substantially burdens any charity's rights besides their own. *Id.* at 196, 200-01. Plaintiff is obligated to allege facts showing that "'no set of circumstances exists under which [the Schedule B policy] would be valid.'" *Wash. State Grange*, 552 U.S. at 449 (quoting *Salerno*, 481 U.S. at 745). The complaint sets forth no such plausible case and the facial challenge is therefore dismissed without prejudice.

### 3. *As-Applied Challenge.*

Defendants next move to dismiss the complaint's claim that the Schedule B disclosure requirement is unconstitutional as applied to Citizens United. An as-applied challenge is viable if plaintiffs plausibly allege that there is "a reasonable probability that" their donors "would face threats, harassment, or reprisals if their names were disclosed." *Citizens United*, 558

10

U.S. at 370. It is "rare," however, that disclosure will result in such "serious and widespread harassment." *Doe*, 561 U.S. at 215 (Sotomayor, J., concurring).[1]

The Supreme Court's seminal decision in *NAACP v. Alabama*, 357 U.S. 449 (1958), sets the benchmark. *See Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.3d 1, 22 (D.C. Cir. 2009). There, the National Association for the Advancement of Colored People challenged Alabama's attempt to force the organization to disclose its members. *NAACP*, 357 U.S. at 460-61. The NAACP's challenge succeeded because the organization "made an uncontroverted showing that

---

[1] Plaintiffs also appear to assert an as-applied challenge by claiming that the disclosure policy will unduly burden them because their donors in particular "value their privacy," and "if individuals know that their names could be divulged to the public, they often will refuse to donate." (FAC ¶¶ 15-16.) However, the desire for privacy and loss of donations alone does not render viable an as-applied challenge to a disclosure regime. *See Buckley*, 424 U.S. at 71-72; *Ctr. for Individual Freedom*, 697 F.3d at 498-99. And even if such a challenge were viable, the complaint fails to properly allege that it is plausible that the attorney general will disclose plaintiffs' donors' identities to the public. Although the attorney general has allegedly instituted a new policy to "obtain *and publicize* the identities of donors to certain non-profit organizations," (FAC ¶ 33 (emphasis in original)), the underlying source quoted in this allegation makes clear that the alleged new policy does not plausibly apply to plaintiffs. Press Release, Att'y Gen. Schneiderman Adopts New Disclosure Requirements for Nonprofits that Engage in Electioneering (June 5, 2013), *available at* http://www.ag.ny.gov/press-release/ag-schneiderman-adopts-new-disclosure-requirements-nonprofits-engage-electioneering. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *Tavares*, 2015 WL 158863, at *3. Furthermore, plaintiffs misrepresent the content of that source in an attempt to overstate the dangers they face. While the complaint suggests that the attorney general has sharpened a special pitchfork for plaintiffs, the attorney general did *not* "identif[y] Citizens United by name," (FAC ¶ 34), in his press release but only mentions the *Citizens United v. FEC* decision. *See* Press Release dated June 5, 2013, *supra*; *accord* Press Release, Att'y Gen. Schneiderman Announces New Disclosure Requirements for Nonprofits that Engage in Electioneering (Dec. 12, 2012), *available at*, http://www.ag.ny.gov/press-release/ag-schneiderman-announces-new-disclosure-requirements-nonprofits-engage-electioneering. Any remaining allegations to suggest that public disclosure is possible are ineffectively pleaded "[u]pon information and belief," (FAC ¶ 32). *See, e.g., Barrett v. Forest Labs., Inc.*, 39 F. Supp. 3d 407, 431-32 (S.D.N.Y. 2014).

11

on past occasions revelation of the identity of its rank-and-file members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility." *NAACP*, 357 U.S. at 462.

Plaintiffs offer a single scant allegation to demonstrate why their donors face similar persecution. Allegedly, plaintiffs' donors "reasonably fear public backlash, financial harm, and worse, should their support of politically contentious and controversial causes become known publicly. That is so because of the controversial nature of both Plaintiffs themselves and the issues on which they speak." (FAC ¶ 17 (citation omitted).) "On information and belief," plaintiffs allege that their "donors' fears are well grounded and evidentiary support will be adduced for them." (FAC ¶ 17.)

These allegations fail to approach either the requisite specificity or severity. *See Nat'l Ass'n of Mfrs.*, 582 F.3d at 22. Plaintiffs provide no factual background or support for their conclusory assertions. And their pledge to "adduce[]" "evidentiary support" in the future to substantiate the alleged "fears" of their donors is useless in the plausibility-pleading era. *See Twombly*, 550 U.S. at 570. The Supreme Court noted some six years ago that "Citizens United has been disclosing its donors for years and has identified no instance of harassment or retaliation." *Citizens United*, 558 U.S. at 370. The complaint in this action suffers from the same flaw: it fails to allege that any donor has suffered in the past due to donating, and it fails to allege any fact that could render future negative consequences plausible.

Plaintiffs mount no response to any of these arguments. The complaint fails to state a plausible as-applied challenge, and that challenge is dismissed without prejudice.

### C. Due Process

Plaintiffs base their next claim upon the Supreme Court's decision in *Federal Communications Commission v. Fox Televisions Stations, Inc.*, 132 S. Ct. 2307 (2012). There, television broadcasters challenged an FCC order that had fined them for airing a "fleeting expletive" and a "brief shot of nudity" on their stations. *Id.* at 2318. Previously, the FCC had long held that such isolated instances of indecent conduct would not result in a fine. *Id.* But the FCC changed its policy without telling the broadcasters of the change,

12

publicly held that the broadcasters had aired actionably indecent conduct, and imposed a $1.24 million fine on one broadcaster. *Id.* at 2314, 2319. Ultimately, the Supreme Court held that the FCC violated due process by sanctioning the broadcasters for conduct that they could not have known was punishable. *Id.* at 2318.

Plaintiffs attempt to fit their due process claim into the *Fox Television* mold. They allege that for nearly 20 years the New York attorney general permitted charities to file redacted versions of their Schedules B but that he unilaterally changed that policy without providing notice. (FAC ¶ 25.) They go on to allege that they "face serious consequences" if they do not comply with the new policy: loss of their registration plus civil penalties of up to $100 per day. (FAC ¶ 31 (citing N.Y. Exec. Law § 177(2).)

Before the Court can address the merits of this claim, it must assuage any doubts about its own jurisdiction. The Court has concluded that this claim is not ripe for adjudication and the Court therefore lacks jurisdiction over it.

A federal court may not constitutionally take jurisdiction over an action which is not yet ripe. *Marchi v. Bd. of Coop. Educ. Servs. of Albany*, 173 F.3d 469, 478 (2d Cir. 1999). Ripeness "'is peculiarly a question of timing'" and "'prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.'" *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687 (2d Cir. 2013) (citations omitted). Ripeness has both constitutional and prudential dimensions, and courts have a duty to address them both, even if *sua sponte*. *See, e.g., Thomas v. City of New York*, 143 F.3d 31, 34 (2d Cir. 1998). At this initial phase of the litigation, plaintiffs have the burden of pleading facts that plausibly show the existence of a due process claim that is ripe for adjudication. *Marchi*, 173 F.3d at 478; *Greenlight Reinsurance, Ltd. v. Appalachian Underwriters, Inc.*, 958 F. Supp. 2d 507, 518 (S.D.N.Y. 2013).

Plaintiffs have not alleged that the attorney general has stripped them of any rights or imposed any penalty as a consequence of their failure to provide unredacted Schedules B. *See Thomas*, 143 F.3d at 35 & n.6; *Valentine Props. Assocs., L.P. v. U.S. Dep't of Hous. & Urban Dev.*, No. 05-cv-2033, 2007 WL 3146698, at *10-11 (S.D.N.Y. Oct. 12, 2007). Even when plaintiffs filed this amended complaint—almost three years after they initially received the deficiency notices—plaintiffs have not alleged that any consequence had yet

13

befallen them. *Cf. Fox Television*, 132 S. Ct. at 2318-19 (noting that the FCC had already publicly held the broadcasters in violation of the FCC's regulation, resulting in some broadcasters suffering reputational injuries and another suffering the imposition of a significant fine). They allege merely only that they "*face* the loss of their registration . . . as well as civil penalties." (FAC ¶ 31 (emphasis added).)

Further, whether the attorney general *will* strip plaintiffs of their licenses or impose a fine depends upon "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Thomas*, 143 F.3d at 34. (citations and quotation marks omitted). And contingencies abound. Will plaintiffs continue to violate the attorney general's policy after this Court upholds its constitutionality? Will the attorney general impose fines on plaintiffs stemming from their now two-year refusal to comply? Only pure speculation can supply the answers to these questions. The statute authorizing penalties is discretionary and there is nothing in the complaint that plausibly alleges how the attorney general typically exercises that discretion. *See* N.Y. Exec. Law § 177(2) (noting that "the attorney general *may*" impose penalties (emphasis added)). As such—absent any allegation that the attorney general has fined non-compliant charities or stripped them of their licenses in the past—it is entirely unclear whether plaintiffs' conduct will ever lead to any actionable consequence. *See Thomas*, 143 F.3d at 34-35, 35 n.6; *Brezler v. Mills*, 86 F. Supp. 3d 208, 218 (E.D.N.Y. 2015). Nor will the parties suffer any undue hardship if plaintiffs' due process claim remains, for the moment, undecided. *Thomas*, 143 F.3d at 35.

It is, therefore, "premature" for this Court to decide whether the attorney general *will* contravene due process if he ultimately bars plaintiffs from soliciting funds or imposes a fine. *Id.* at 34-35. Thus, the complaint fails to allege that plaintiffs have "suffered any harm to their procedural due process rights," and the action is neither constitutionally nor prudentially ripe. *Id.* at 35 & n.6. The Court *sua sponte* dismisses this claim for lack of subject matter jurisdiction.

### D. Preemption

We come next to plaintiffs' last federal claim: that federal law preempts New York's Schedule B policy. A claim of preemption is only viable if "the challenged state law 'stands as an obstacle to the accomplishment and

14

execution of the full purposes and objectives of Congress.'" *Arizona v. United States*, 132 S. Ct. 2492, 2500 (2012) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). Further, courts "should assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'" *Id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)); *see also Citizens United*, 115 F. Supp. 3d at 472 (citing *Steel Inst. of N.Y. v. City of N.Y.*, 716 F.3d 31, 36 (2d Cir. 2013)).

Citizens United contends that the Internal Revenue Code establishes both "a general rule of non-disclosure of tax information" and "an extensive regulatory regime to govern and protect the release of tax information." (FAC ¶ 57.) According to plaintiffs, the attorney general's attempt to access that same information without engaging the IRS's process "circumvent[s]," *Citizens United*, 115 F. Supp. 3d at 472, the federal disclosure process, and is therefore preempted. (FAC ¶¶ 56-59.)

But this Court has already determined in this action that nothing in the Internal Revenue Code or its legislative history demonstrates the "'clear and manifest purpose of Congress,'" *Arizona*, 132 S. Ct. at 2501 (quoting *Rice*, 331 U.S. at 230), to prohibit states from requiring tax-exempt organizations to disclose to the state portions of their federal tax filings. *Citizens United*, 115 F. Supp. 3d at 472-73. There is no reason to depart from that legal conclusion here. The Internal Revenue Code states:

> "Upon written request by an appropriate State officer, the Secretary may make available for inspection or disclosure returns and return information of any organization described in section 501(c) . . . for the purpose of, and only to the extent necessary in, the administration of State laws regulating the solicitation or administration of the charitable funds or charitable assets of such organizations."

26 U.S.C. § 6104(c)(3).

At most, however, this language establishes that "'Congress sought to regulate the disclosures that the IRS may make.'" *Citizens United*, 115 F. Supp. 3d at 472. (quoting *Ctr. for Competitive Politics*, 784 F.3d at 1319). Neither the statutory text—nor its legislative history—suggest that Congress meant to "broadly prohibit other government entities from seeking [tax] information directly from the organization" that originally filed it. *Ctr. for Competitive Politics*, 784 F.3d at 1319. States may therefore

15

require tax-exempt organizations to disclose Schedules B to state authorities without circumventing federal law.

Plaintiffs offer no new arguments to rebut this legal conclusion except the contention—asserted repeatedly without support—that they are entitled to further "factual development" to aid their claim. (Mem. in Opp. at 21.) But preemption is a purely legal question concerning Congress' intent. *See Arizona*, 132 S. Ct. at 2501. No factual development is needed. This claim is dismissed with prejudice.

### E. *Ultra Vires*

Finally, the complaint asserts that plaintiff Citizens United—but not plaintiff Citizens United Foundation—cannot be regulated as a "charitable organization," N.Y. Exec. Law § 172; 13 N.Y.C.R.R. § 90.2(a)(4), because it is a "social welfare" group. 26 U.S.C. § 501(c)(4). The Court agrees with the attorney general that this claim is meritless.

New York law delegates to the state attorney general the authority to regulate "charitable organizations" within New York. N.Y. Exec. Law § 172. This delegation allows him "'to fill in the interstices in the legislative product.'" *Allstate Ins. Co. v. Rivera*, 12 N.Y.3d 602, 608 (2009) (citations omitted). The attorney general is therefore free to define "charitable organization" in a manner "that go[es] beyond the text of that legislation," as long as his definition is "not inconsistent with the statutory language or its underlying purpose," *Gen. Elec. Capital Corp. v. N.Y. State Div. of Tax Appeals*, 2 N.Y.3d 249, 254 (2004).

State law defines "charitable organization" in relevant part as "[a]ny benevolent, philanthropic, patriotic, or eleemosynary person." N.Y. Exec. Law § 171-a(1). Citizens United contends these are "very traditional terms of art" that cannot be expanded to encompass organizations "operated exclusively for the promotion of social welfare," 26 U.S.C. § 501(c)(4). (Plfs.' Opp. to Def.'s Mot. to Dismiss at 22, Dkt. No. 63.) Although Citizens United's narrow interpretation of section 171-a(1) is a possible one it is by no means the only reasonable one. As such the attorney general may use his delegated authority to apply section 172 to social welfare groups. Doing so is not "'inconsistent'" with the broad "'statutory language or its underlying purpose,'" *Allstate Ins. Co.*, 12 N.Y.3d at 608 (quoting *Gen. Elec. Capital Corp.*, 2 N.Y.3d at 254).

16

Citizens United next urges that the attorney general's own regulations defining "charitable organization" clearly exempt social welfare organizations from the charitable solicitation regime. The regulations state that: "The term *charitable organization* includes . . . without limitation: . . . organizations exempt from Federal income taxation pursuant to [an Internal Revenue Code section other than § 501(c)(3)] that are organized and/or operated for charitable purposes." 13 N.Y.C.R.R. § 90.2(a)(4) (emphasis in original). According to Citizens United, social welfare groups organized pursuant to section 501(c)(4) are not "operated for charitable purposes" and thus do not fall within the attorney general's own definition of "charitable organization," 13 N.Y.C.R.R. § 90.2(a)(4), and cannot be regulated.

Contrary to Citizens United's contentions, social welfare organizations may well be "organized and/or operated for charitable purposes." 13 N.Y.C.R.R. § 90.2(a)(4). State regulations clearly recognize that "promoting social welfare" may indeed be "charitable." 13 N.Y.C.R.R. § 90.1(a). Federal regulations concur: The term "charitable" includes the "promotion of social welfare." 26 C.F.R. §§ 1.501(c)(3)-1(d)(2), 1.501(c)(4)-1(a)(2).

Further, Citizens United itself is sufficiently "charitable" so as to fall under the purview of the attorney general's regulations. 13 N.Y.C.R.R. § 90.2(a)(4). Charitable purposes include those that are "educational," "cultural," and "for a public benefit." 13 N.Y.C.R.R. § 90.1(a)-(b). New York regulations even state that "promoting social welfare" can be itself a "charitable purpose." *Id.* As the complaint alleges, "[t]hrough a combination of education, advocacy, and grassroots programs, Citizens United seeks to promote traditional American values of limited government, free enterprise, strong families, and national sovereignty and security." (FAC ¶ 3.) The complaint thus makes clear that Citizens United engages in activities designed for "educational" purposes and for "public benefit" and falls smack dab within the attorney general's own definition of "charitable organization."

Citizens United—along with vast numbers of other social welfare groups—is properly regulated as a "charitable organization." The complaint's sole state law claim is therefore dismissed with prejudice.

### III. CONCLUSION

Defendant's motion to dismiss the Amended Complaint is granted in its entirety. The complaint states not a single plausible claim upon which relief can be granted.

Court I of the First Amended Complaint is dismissed without prejudice. The due process claim embedded in Count III is dismissed for lack of subject matter jurisdiction, and the remainder of Count III is dismissed without prejudice. Counts II and IV—the state law and federal preemption claims—are dismissed with prejudice. If plaintiffs chose to do so, they may seek leave to file a Second Amended Complaint fifteen days after the date of this Opinion & Order.

Dated: New York, New York
      August 29, 2016

SO ORDERED:

*[signature]*

Sidney H. Stein, U.S.D.J.